Christine **TEACHOUT**, Appellant,

v.

**FOREST CITY COMMUNITY SCHOOL DISTRICT**, Appellee.

No. 97–683.

Supreme Court of Iowa.

Sept. 23, 1998.

Mark A. Newman, Forest City, for appellant.

Joel J. Yunek and Richard R. Winga of Laird, Heiny, McManigal, Winga, Duffy & Stambaugh, P.L.C., Mason City, for appellee.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and TERNUS, JJ.

TERNUS, Justice.

Appellant, Christine Teachout, brought suit against her employer, appellee, Forest City Community School District, alleging she had been terminated from her position as a teaching assistant in retaliation for her attempts to report child abuse. The district court granted the District's motion for summary judgment on the basis Teachout could not prove that her reporting of child abuse was the determining factor in the District's decision to discharge her. We agree and affirm.

## I. Standard of Review.

A summary judgment ruling is reviewed for errors of law. See Bearshield v. John Morrell & Co., 570 N.W.2d 915, 916 (Iowa 1997). Summary judgment should be granted where the moving party shows there is no genuine issue of material fact and he or she is entitled to judgment as a matter of law. See Iowa R. Civ. P. 237(c). In assessing whether the movant has met this standard, we view the record in the light most favorable to the nonmoving party. See Bearshield, 570 N.W.2d at 917.

## II. Background Facts.

The record, when viewed in a light most favorable to Teachout, shows the following facts. In August 1995, Teachout was hired by the District as one of four teacher's assistants for a classroom of severely and profoundly disabled students. (She was also employed by the District as a cheerleading coach and bus driver.) As a teaching assistant, Teachout was supervised by the classroom teacher, Alyssan Fitzgerald. Fitzgerald, in turn, reported to the school principal, Lee Hinkley.

The record shows, and Teachout does not contest, that there was a personality clash between Fitzgerald and Teachout almost from the beginning of the school year. Fitzgerald's employment by the District was her first teaching position after graduating from college. In contrast, Teachout had worked with severely and profoundly disabled students for fourteen years. As a result, Fitzgerald and Teachout did not work well together. Fitzgerald claimed Teachout was not doing her job, did not follow directions, and assumed a controlling role in the classroom. A diary kept by Teachout documents numerous conflicts between Teachout and Fitzgerald, as well as between Teachout and the other teaching assistants. Most of these documented conflicts were unrelated to any incidents later alleged by Teachout to be abusive.

As early as October 5, Teachout felt her job was in jeopardy. Yet there is no evidence that Fitzgerald or any school administrator was aware at this time of Teachout's concern that child abuse had occurred in the classroom. At some point prior to mid-October, Fitzgerald discussed the situation with Hinkley.

Teachout testified that in late September and October she observed conduct toward the disabled students by Fitzgerald and one of the other assistants that Teachout viewed as child abuse. She eventually reported her concerns to a special education teacher, Sandy Plath, in mid-October. In addition, Teachout told Fitzgerald that she was documenting Fitzgerald's treatment of the students. On October 16 Plath called Hinkley to inform him that Teachout believed the disabled students had been subjected to abusive treatment.

After having been contacted by Fitzgerald and Plath, Hinkley met on several occasions with the classroom staff to address the continuing problems involving the employees' working relationships. In one meeting, Hinkley met with only Fitzgerald and Teachout. They talked about Teachout's perception that she was not being treated the same as the other assistants. Fitzgerald voiced her problems with Teachout's perceived interference with other staff members and her failure to follow instructions. Later, Hinkley met with two of the other teaching assistants who related continuing friction among the employees in the classroom. They reported that Fitzgerald was trying to improve the working relationships, but had not been suc-

cessful. They told Hinkley the situation was having a negative impact on the staff and students.

The tension between Fitzgerald and Teachout continued. On November 15, after a confrontation between Teachout and Fitzgerald regarding Teachout's role in the classroom, Fitzgerald requested that Hinkley terminate Teachout's employment. Hinkley called Teachout that night and told her she was to be terminated as a teaching assistant in Fitzgerald's classroom. They agreed that Hinkley would explore the availability of other positions in the district.

The next day Teachout contacted the Department of Human Services (DHS) to make an oral report of her suspicions of child abuse. DHS agreed to send the necessary forms to Teachout and directed her to make her report to the local area education agency (AEA). Teachout received the forms and mailed the completed report to the AEA on November 18. It was later returned because it had not been completed correctly.

On November 20, Hinkley called Teachout and asked her to resign. He told her he had been unable to locate any other available position in the District. Teachout refused to resign and requested a meeting with the District's superintendent, Wayne Sesker. There is no evidence that Fitzgerald, Hinkley, or Sesker knew Teachout had contacted DHS about her allegations of abuse, or that she had forwarded a written report to the AEA.

Teachout met with Sesker the next day, November 21, and told him about her concerns of abuse. Sesker discussed the classroom situation with her and told her to meet with Hinkley on November 27, the next work day, instead of reporting to Fitzgerald. Teachout asked Sesker if he had the forms for reporting child abuse. When he was unable to locate any, he directed her to Hinkley. Hinkley was also unable to find the requested forms. Teachout then obtained the forms from DHS and immediately made proper written reports of the alleged abuse.

When Teachout returned to school on November 27 after Thanksgiving break, Hinkley gave her a letter of termination. After her discharge as a teaching assistant in the severely and profoundly disabled classroom, Teachout remained employed by the District as a cheerleading coach and bus driver.

The District was unaware of Teachout's official reports of child abuse until the day following her termination. The abuse reports were eventually determined to be unfounded.

### III. Prior Proceedings.

Teachout sued the District claiming that her termination was wrongful because it violated public policy.[1] The district court granted the District's motion for summary judgment. Although the court concluded that Teachout had engaged in a protected activity, it found she had failed as a matter of law to establish a causal connection between her termination and her protected conduct. Teachout appealed.

### IV. General Legal Principles Governing Teachout's Wrongful Discharge Claim.

The parties agree that Teachout is an employee at will. Even an employee at will, however, may not be terminated for a reason contrary to public policy. See Lockhart v. Cedar Rapids Community Sch. Dist., 577 N.W.2d 845, 846 (Iowa 1998). When an employee is terminated for a reason that violates a well-established public policy, the employee has a remedy for damages. See Springer v. Weeks & Leo Co., 429 N.W.2d 558, 559–60 (Iowa 1988).

To recover damages under these circumstances, a plaintiff must establish (1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two. Cf. Hulme v. Barrett, 480 N.W.2d 40, 42 (Iowa 1992) (discussing prima facie case for statutory retaliatory discharge claim under Iowa's civil rights law).

1. In the district court, Teachout also claimed a violation of the National School Lunch Act based on an incident in which a student was not allowed to eat lunch. This claim was dismissed on the District's summary judgment motion. Teachout has not appealed this aspect of the court's ruling.

There is no dispute that Teachout suffered an adverse employment decision—her termination as a teacher's assistant. The controversy in this case is whether there is evidence to support a finding that Teachout engaged in a protected activity and whether this activity was causally linked to her discharge. We address these issues separately.

## V. Involvement in a Protected Activity.

■ A. *Reporting of child abuse as a protected activity.* There need not be an express statutory mandate of protection before an employee's conduct is shielded from adverse employment action. *See Borschel v. City of Perry*, 512 N.W.2d 565, 568 (Iowa 1994). Nevertheless, the employee's activity must advance a well-recognized and defined public policy of the state. *See French v. Foods, Inc.*, 495 N.W.2d 768, 770 (Iowa 1993).

■ We have found such a public policy expressed in certain legislative enactments. Thus, a cause of action has been recognized when an employee is terminated in retaliation for asserting a right to workers' compensation benefits. *See Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 353 (Iowa 1989); *Springer*, 429 N.W.2d at 560. We have also held that a discharge in retaliation for filing a claim for partial unemployment benefits is actionable. *See Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994). In determining whether the reporting of suspected child abuse is likewise protected, it is helpful to understand the basis for our recognition of a common-law retaliatory discharge claim in the cited cases.

In *Springer*, this court concluded that the workers' compensation statute clearly expressed "the public policy of this state that an employee's right to seek the compensation which is granted by law for work-related injuries should not be interfered with regardless of the terms of the contract of hire." 429 N.W.2d at 560–61. This holding was based on Iowa Code section 85.18 (1987), which provided that " '[n]o contract, rule, or device whatsoever shall operate to relieve the employer, in whole or in part, from any liability created by this chapter except as herein provided.' " *Id.* at 560 (quoting Iowa Code § 85.18 (1987)). We observed that to permit the retaliatory discharge alleged in

*Springer* "would fly in the face of this policy." *Id.* at 561.

In *Lara*, we found an equally clear expression of public policy in the unemployment compensation law. We noted the legislature's declaration that " '[e]conomic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state.' " *Lara*, 512 N.W.2d at 782 (quoting Iowa Code § 96.2 (1989)). The unemployment compensation statute additionally provided that " '[a]ny agreement by an individual to waive, release, or commute the individual's rights to benefits or any other rights under this chapter shall be void.' " *Id.* (quoting Iowa Code § 96.15(1) (1989)). Finally the legislature made it a serious misdemeanor for any employer to violate this provision of the statute. *Id.* We concluded an employer's retaliatory discharge of an employee seeking partial unemployment benefits conflicted with these legislatively-declared goals. *Id.*

We turn now to an examination of our child abuse laws. Our legislature has enacted a statute for the reporting and investigation of suspected cases of child abuse. *See* Iowa Code §§ 232.67–.77 (1995). The general assembly has determined that

> [c]hildren in this state are in urgent need of protection from abuse. It is the purpose and policy of this [statute] to provide the greatest possible protection to victims or potential victims of abuse through encouraging the increased reporting of suspected cases of such abuse, insuring the thorough and prompt investigation of these reports. . . .

*Id.* § 232.67. In addition, the Iowa Code provides that "[a] person participating in good faith in the making of a report . . . pursuant to this chapter . . . shall have immunity from any liability, civil or criminal, which might otherwise be incurred or imposed. . . ." *Id.* § 232.73. Furthermore, "any person, official, agency or institution required by this chapter to report a suspected case of child abuse who knowingly and willfully fails to do so is guilty of a simple misdemeanor." *Id.* § 232.75. Although chapter 232 does not specifically mandate protection for an employee who in good

faith makes a report of suspected child abuse, we think the forceful language of the statute articulates a well-recognized and defined public policy of Iowa from which such protection can be implied. *See McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or.App. 107, 684 P.2d 21, 23 (1984) (recognizing wrongful discharge claim where employee is fired for threatening to report to appropriate state agency employee's good-faith belief that employer nursing home was mistreating patients).

■ B. *Factual issue as to whether Teachout engaged in a protected activity.* There is evidence in the record from which a fact finder could conclude that Teachout had contacted the proper authorities to make oral and written reports of child abuse prior to her termination. *See generally* Iowa Code § 232.70(1) (allowing permissive reporter to report abuse either orally or in writing). Because the record may not support a finding that the District knew, before it discharged Teachout, that she had reported the suspected abuse, we must also consider whether Teachout's *intent* to report child abuse could constitute protected activity so as to support a claim of retaliatory discharge. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir.1994) (stating a causal link between a protected activity and an adverse employment action cannot be found if the employer had no knowledge of the protected activity).

We think a finding by the jury that Teachout had a good-faith intent to file a report would constitute protected activity. *See Niblo*, 445 N.W.2d at 351 (holding a cause of action for wrongful discharge existed upon proof that the employee was terminated for threatening to file a workers' compensation claim). It would be contrary to the public policy articulated in our child abuse laws to allow an employer to take adverse employment action on the basis of an employee's intent to report child abuse. That is because the employer's action would have the effect of *discouraging* the reporting of suspected abuse in direct opposition to the public policy of *encouraging* the reporting of child abuse. Consequently, if Teachout had a subjective good-faith belief that child abuse had occurred, she is protected from any retaliatory action by her employer causally related to her intent or threat to report the abuse. *Cf. Garvis v. Scholten*, 492 N.W.2d 402, 404 (Iowa 1992) (interpreting statutory tort immunity for improper disclosure of medical information pursuant to a child abuse investigation as requiring a subjectively good-faith participation in the investigation).

■ The District argues, however, that Teachout's failure to immediately report her suspicions of abuse to the proper authorities takes her conduct out of a protected category. It contends that Teachout's conduct should not be protected because it is contrary to the legislature's intent that child abuse be reported promptly. Despite the general assembly's obvious desire to encourage prompt reporting, we think an employee's delay in making a report of abuse does not operate to deny her a remedy for a retaliatory discharge. The negative impact on the accomplishment of the statutory objectives that would result from denying protection to the employee outweighs the nominal inconsistency in granting protection to the dilatory reporter.

Because there are facts in the record from which a fact finder could conclude that Teachout had a good-faith belief that child abuse had occurred in her classroom, her intent to report the abuse is protected even if she did not make a child abuse report promptly and even if she did not officially report the abuse prior to her termination of employment. Therefore, the district court properly ruled that a factual issue existed as to this element of Teachout's wrongful discharge claim. We now consider whether the district court correctly concluded that Teachout had not demonstrated a factual issue on the causation element of her claim.

VI. *Causation.*

■ The causation standard in a common-law retaliatory discharge case is high. *Cf. Hulme*, 480 N.W.2d at 42 (discussing statutory retaliatory discharge claim). The employee's engagement in protected conduct must be the *determinative* factor in the employer's decision to take adverse action against the employee. *See Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686

(Iowa 1990); *Graves v. O'Hara*, 576 N.W.2d 625, 628 (Iowa App.1998). A factor is determinative if it is the reason that "tips the scales decisively one way or the other," even if it is not the predominant reason behind the employer's decision.[2] *See Smith*, 464 N.W.2d at 686. Thus, we examine the evidence to determine whether a reasonable fact finder could conclude that Teachout's intent to report the alleged incidents of child abuse was the determinative factor in the District's decision to fire her.

A reasonable fact finder could find that prior to her discharge, Teachout had decided to report the conduct of Fitzgerald and the other teaching assistants to the proper authorities as instances of child abuse. The fact finder could also find that Fitzgerald, Hinkley, and Sesker knew before Teachout was terminated that Teachout intended to file a report of child abuse. In essence, this evidence simply establishes that Teachout's termination occurred after the District learned she had engaged in a protected activity. We have previously held that such evidence is insufficient to establish causation. *E.g., Phipps v. IASD Health Servs. Corp.,* 558 N.W.2d 198, 203 (Iowa 1997); *Hulme,* 480 N.W.2d at 43; *accord Graves,* 576 N.W.2d at 628.

In *Hulme,* the employee had filed an age discrimination claim against her employer with the Iowa Civil Rights Commission. 480 N.W.2d at 42. Seven months later she was fired when she challenged her employer's nonsmoking policy. *Id.* We affirmed a judgment in favor of the employer on the employee's retaliatory discharge claim because the employee had failed to introduce sufficient evidence to support the causation element of her claim. *Id.* at 43. We noted that "the protection afforded by anti-retaliatory legislation does not immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination." *Id.* Thus, " 'the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim.' " *Id.* (quoting *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1314 (6th Cir. 1989)). We noted the absence of any testimony connecting the employee's complaint about the nonsmoking policy to her earlier discrimination claim. *Id.* We also pointed to evidence that the employee had a persistent negative attitude that was a frequent source of friction with her supervisor and other employees. *Id.*

More recently, in a case more closely on point factually and procedurally, we affirmed a summary judgment for the employer in a wrongful discharge case because there was inadequate proof of causation. *See Phipps,* 558 N.W.2d at 203. In *Phipps,* the employee claimed he was terminated because he had filed a grievance questioning the legality of his employer's conduct under the Iowa Wage Payment Collection Law. *Id.* at 201, 203. The evidence showed that the employee was fired approximately one month after filing his grievance. *Id.* at 203. We held the fact that his termination followed the filing of his grievance was insufficient to generate a jury question on retaliation. *Id.* We pointed out the employee's unacceptable performance and repeated disciplinary problems were legitimate reasons for his discharge. *Id.*

These cases can be helpfully contrasted with three cases in which we found sufficient evidence of causation. *See City of Hampton v. Iowa Civil Rights Comm'n,* 554 N.W.2d 532, 536 (Iowa 1996); *Niblo,* 445 N.W.2d at 353; *Springer,* 429 N.W.2d at 562. A review of these cases shows that in each one there was evidence showing a causal connection in addition to the timing of the adverse employment action.

In *City of Hampton,* we held that substantial evidence supported the Commission's finding that the employer's reduction of the

---

2. We overrule that part of the court of appeals' decision in *Butts v. University of Osteopathic Med. & Health Sciences,* 561 N.W.2d 838, 842 (Iowa App.1997), in which the court of appeals judged the evidence on causation against a standard requiring that the protected conduct be "the determining *or predomina[nt]* factor" in the employer's decision to take adverse action. (Emphasis added.) As we have stated, the protected conduct must be the determining factor, but not the predominant factor.

employee's working hours and other adverse employment action were due to the employee's filing of a discrimination claim against her employer. 554 N.W.2d at 536. The evidence showed that when the employee asked why her hours were being reduced, her supervisor responded that he "didn't like that civil rights mess hanging over his head." *Id.* In addition, the supervisor repeatedly threatened to sue the employee because of statements she had made in her civil rights complaint. *Id.*

In *Niblo,* we affirmed a jury verdict for the employee on her retaliatory discharge claim, finding sufficient evidence of causation. 445 N.W.2d at 353. The evidence showed that the employee had a skin condition she believed was caused by her job. *Id.* When the employee contacted her supervisor about going to the doctor, he told her the company was not going to pay for her to see a physician. *Id.* Later, when the employee told the company president that her doctor recommended goggles, protective cream, and continued treatment, he became irate and told her that he was not going to pay workers' compensation or unemployment benefits. *Id.* At the conclusion of this outburst, he fired her. *Id.*

In *Springer,* we reversed a directed verdict in favor of the employer on the employee's wrongful discharge claim and found the evidence sufficient to sustain the employee's contention that her termination was due to her filing of a workers' compensation claim. 429 N.W.2d at 562. The employee had testified that when she returned to her employment after treatment for her work-related condition, her supervisor refused to let her work unless she signed a document stating that her problems were not work related. *Id.* at 559. The employee refused to do so and was discharged three days later. *Id.*

In the case before us there is no evidence that Fitzgerald, Hinkley or Sesker discouraged Teachout from filing a report of child abuse or that they even made any negative statements concerning her belief that child abuse had occurred. On the other hand, Teachout herself concedes that there was a personality conflict between her and the supervising teacher in the classroom. This conflict and its adverse consequences on the students were verified by Teachout's coworkers. We think this case does not contain the evidence of retaliation present in those cases in which we have found the evidence sufficient to support a finding of causation. Rather, it is more similar to *Hulme* and *Phipps,* in which we concluded the evidence was inadequate. Therefore, we agree with the district court's conclusion that Teachout failed to generate a jury question on the issue of causation.

### VII. *Summary.*

The termination of an employee because of the employee's good-faith intent to report suspected child abuse is actionable. Nevertheless, the district court correctly granted the District's motion for summary judgment on Teachout's wrongful discharge claim because she failed to produce sufficient evidence of a causal connection between her firing and her intent to report child abuse.

**AFFIRMED.**