**Byron Lee COLEMAN, Plaintiffs,**

v.

**SWIFT & COMPANY, f/k/a Monfort, Sipco Inc., Swift Independent Packing Co., Con–Agra, Inc., d/b/a Swift and Company, Monfort Pork, Monfort, and Swift and Company, Defendants.**

No. 4–98–30014.

United States District Court,
S.D. Iowa,
Central Division.

May 20, 1999.

Philip F. Miller, West Des Moines, IA, for Byron L. Coleman, plaintiff.

F. Richard Lyford, John K. Vernon, Dickinson Mackaman Tyler & Hagen, Des Moines, IA, for Swift & Company, defendant.

Russell L. Samson, Dickinson Mackaman Tyler & Hagen, Des Moines, IA, for Con–Agra, defendant.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

WALTERS, Chief United States Magistrate Judge.

This matter is before the Court on defendants' motion for summary judgment and plaintiff's cross-motion for summary judgment. Plaintiff originally brought this lawsuit in the Iowa District Court in and for Marshall County, on October 16, 1997, in two counts against Swift & Company and Con–Agra, Inc., their related corporate entities and individual defendants. Plaintiff alleged wrongful discharge and fraudulent misrepresentation in connection with his termination from employment. On December 17, 1997, an Order dismissing the individual defendants was entered by the Iowa district court. On January 9, 1998, the remaining defendants Swift & Company ("Swift") and Con–Agra, Inc. ("Con–Agra") removed this lawsuit to federal court pursuant to 28 U.S.C. § 1441(a) as the plaintiff and remaining defendants were now diverse, giving the Court original jurisdiction under 28 U.S.C. § 1332. The parties consented to proceed before a United States Magistrate Judge and the case was assigned to the undersigned on April 2, 1998. *See* 28 U.S.C. § 636(c).

### I.

The standards for summary judgment are well known and the Court will not dwell on them at length. Defendants are entitled to summary judgment if the affidavits, pleadings, and discovery materials "show that there is no genuine issue as to any material fact and that [defendant] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Although we view the facts in a light most favorable to the non-moving party, in order to defeat a motion for summary judgment, the non-moving party cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." *Carter*

*v. St. Louis University*, 167 F.3d 398, 401 (8th Cir. Feb.1, 1999).

Though this is not an employment discrimination case, like such cases it involves the employer's motivation for taking an alleged adverse employment action. The Eighth Circuit has cautioned that summary judgment may not be suitable in employment cases because the proof "often depend[s] on inferences rather than on direct evidence." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991)). *See also Webb v. St. Louis Post–Dispatch*, 51 F.3d 147, 148 (8th Cir.1995); *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995); *Kunzman v. Enron Corp.*, 902 F.Supp. 882, 892 (N.D.Iowa 1995). Still, even in employment cases summary judgment "remains a useful tool to determine whether or not any case ... merits trial." *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir.1999). *See Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998) ("summary judgment is proper if a plaintiff fails to establish any element of his or her prima facie case"); *Snow v. Ridgeview Medical Ctr.*, 128 F.3d 1201, 1205 (8th Cir.1997) ("summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case").

Defendants' motion challenges plaintiff's fraud claim as failing to state a claim upon which relief may be granted and further alleges that there is no evidence to support the wrongful discharge claim. In his cross-motion plaintiff claims the undisputed facts show defendants committed fraudulent misrepresentation and wrongfully discharged him from employment. Plaintiff did not specifically dispute the facts set forth in defendants' statement of undisputed facts, but submitted his own statement of undisputed facts.

## II.

Byron Coleman was first employed at the pork plant in Marshalltown, Iowa, now owned by Swift & Company, starting in 1984.[1] He held various jobs, working his way up through the ranks to a supervisory position in 1991. (Coleman Depo. at 13 and 20). During the period of time he worked at the plant, he made several workers' compensation claims for which first reports of injury were prepared. (Exs. B, C, D, E, F, and G).

In 1993 Coleman was promoted to Operations Manager of MSP, an affiliated organization also operating in the same physical facility. (Coleman Depo. at 27). On July 28, 1994, a fellow employee became concerned when Coleman was unable to communicate and started shaking. (*Id.* at 35–58). The employee summoned the plant nurse, Anna Welton. She found Coleman with his hands in his pockets, repeating that he could not take it any more, was unable to make decisions, and had to get away from his job. (Coleman Doc. at 0163; Coleman Depo. at 35–36). Welton summoned Coleman's wife and made arrangements for him to see his family doctor, Dr. Axel Lund in Marshalltown. (Coleman Doc at 0163; Coleman Depo. at 38). Coleman was off work for two weeks. During that time he saw a psychologist in Newton, Dr. Stern, and medication was prescribed. Following the two-week absence, Coleman returned to work. (Coleman Depo. at 39–42). No first report of injury or workers' compensation claim was filed for this 1994 incident. Coleman had no health care limitations or restrictions upon his return. (*Id.* at 43–46). At his request, Coleman was reassigned to another position, that of "fill-in supervisor" on the night shift. (*Id.* at 41–42). After a few months Coleman wanted to transfer to days and applied for an open position as "cut floor supervisor". (*Id.* at 47–48). He was given that job, where his immediate supervisor was day shift General Foreman Dave Feeback. (*Id.* at 47, ll. 3–4). Feeback's immediate supervisor was day shift Operations Manager Vern Cosselman. (*Id.* at 48). Coleman worked in

---

**1.** For convenience the defendants are collectively referred to herein as "Swift."

that position without incident from 1994 until March 26, 1997.

On Wednesday, March 26, 1997, Coleman reported to the Health Services Department at the plant and talked to nurse Welton. He was in tears and shaking. He told Welton his father was in the hospital, but he was afraid to take time off to spend with him because he might lose his job. (Coleman Doc. at 0165). He also told her he was "losing it again," couldn't "take it anymore," and felt harassed by his superiors. (*Id.*) He blamed Cosselman and Feeback for his problems. (*Id.*) Welton suggested he talk to plant manager Mike Weber about taking time off if he did not feel comfortable talking with Cosselman or Feeback. (*Id.*)

Welton summoned Feeback to her office. In her presence Coleman told Feeback he needed to see a doctor and was having trouble dealing with things. (*Id.*) Feeback responded to the effect that "we all have problems" and "life goes on." (*Id.*)

Welton immediately made arrangements for Coleman to see Dr. Lund that day. Dr. Lund examined Coleman, suggested he take the remainder of the week off, prescribed some medication and suggested some counseling as an option. (Coleman Depo. at 119). Coleman did not obtain counseling at that time, or obtain the medication, and returned to work later that same morning. (Coleman Depo. at 122–23; Coleman Doc. at 0165–166). Nurse Welton noted he was back at work that day and asked him why he had returned. Coleman responded he was afraid of losing his job. (Coleman Doc. at 0166).

Coleman returned to work on Thursday, March 27 and worked every scheduled work day through April 3, 1997, without further incident. (Coleman Depo. at 128–132). No first report of injury was filed at the time with respect to the March 26 episode. There is no evidence in the summary judgment record that Coleman said anything to Welton or others about a workers' compensation claim.

On Wednesday, April 2, 1997, Coleman's father suffered a heart attack while he was in the hospital being treated for cancer. Coleman learned of the heart attack sometime the evening of April 2. (*Id.* at 122, 136). Coleman worked his normal shift the next day and did not during that shift request time off. (*Id.* at 136–37). During the evening hours of April 3, Coleman called Cosselman at home. (*Id.* at 134, 145). Coleman told Cosselman he would not be able to report for work on Friday April 4 as the family was meeting at the hospital. (*Id.* at 145). The purpose of the meeting was "just to be there and to be together as a family." (*Id.* at 146).

According to Coleman, Cosselman responded to the effect that "everyone loses their parents and you have a job to consider." (*Id.* at 147). Coleman says he was taken aback at this harshness and asked, "what do you have to do, quit to get a day off when your Dad's dying?" to which Cosselman replied, "you have to do what you have to do." (*Id.*). Apparently, Cosselman gave Human Resources Manager Tony Harris a written statement about the conversation on April 7 which supports Coleman's recollection of the conversation in material respects. (Harris Depo. at 16).

Coleman testified in his deposition that he told Cosselman he was changing his vacation plans to take the following week off. Cosselman made no response. (Coleman Depo. at 148).

Coleman testified that on March 26 he went to see Plant Manager Weber, presumably as Welton had recommended. He told Weber he was having trouble coping and asked to be moved to a different area of the plant. (Coleman Depo. at 132). Weber said would see what he could do. (*Id.*) Subsequently, sometime before April 4, Coleman says he went to see Weber about moving his vacation to the following week. Coleman testified Weber responded by telling him not to worry, that he would take care of it with Cosselman and Feeback. (Coleman Depo. at 143). Coleman spent April 4 with his family at the hospital. He went home at mid-afternoon and called Mr. Weber about taking vaca-

tion the following week. According to Coleman, Weber again told him not to worry, to go ahead and take care of his family, and he would see him a week from Monday. (*Id.* at 153–54).

Only a brief portion of Cosselman's deposition is in the summary judgment record, and it does not deal much with the events leading to the termination of Coleman's employment. It is evident from other information in the record, however, that Cosselman will testify he thought Coleman had resigned during their April 3 telephone call. This impression was confirmed when Coleman did not report for work on April 4 or the following week. When Coleman did not show for work on April 7, Feeback called him at home in the morning. Coleman told Feeback he was on vacation for the week. Feeback was unaware of any vacation change and suggested plaintiff come to the plant to straighten the issue out. (*Id.* at 155–57). Coleman told Feeback he would not come in, that Weber could explain the situation and that he (Coleman) viewed the request as harassment. (*Id.* at 156–7).

On Thursday, April 10, 1997, Coleman went in to pick up his paycheck. At that time he found Feeback and Cosselman in the office. Cosselman indicated to Coleman that as far as he was concerned Coleman had quit his job. (*Id.* at 162). Cosselman suggested Coleman go see human resources manager Harris before he left the plant. (*Id.* at 162). Coleman did so and Harris informed him that it was his information Coleman had quit during the Thursday night phone conversation with Cosselman, that plaintiff did not appear for work on April 4, 7, 8, 9 or 10 and was therefore no longer an employee. (*Id.* at 163). Coleman was paid his accrued vacation and holiday pay after his discharge. (Harris Depo. at 18–19). Prior to this time he had a good work, performance and attendance record. (Weber Depo. at 13–14, 21).

III.

A. *Wrongful Discharge*

 Coleman claims the circumstances amount to a retaliatory termination because he exercised his rights under Iowa workers' compensation law. Iowa courts recognize an exception to at-will employment arising from discharge in violation of public policy when an employee's termination is in retaliation for "exercising a statutory right or refusing to commit an unlawful act". *Borschel v. City of Perry*, 512 N.W.2d 565, 567 (Iowa 1994) (quoting 82 Am.Jr.2d *Wrongful Discharge* § 14, at 684 (1992)); *Springer v. Weeks & Leo Co., Inc.*, 475 N.W.2d 630, 633 (Iowa 1991). Public policy must be clearly expressed, *Borschel*, 512 N.W.2d at 567, either by the Iowa legislature or by federal law. *Smuck v. National Management Corp.*, 540 N.W.2d 669, 672 (Iowa App. 1995). "To recover damages ..., a plaintiff must establish (1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two." *Teachout v. Forest City Community Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998). Swift's motion takes aim at the first and third elements.

*Protected Activity.*

The first element of plaintiff's claim is very doubtful on the facts disclosed in the record and under Iowa law. The Court does not base its ruling on the insufficiency of the evidence on this element because the lack of proof on the third, causation element, is clearer. Brief discussion is appropriate here, however, to point out the legal and factual difficulties in plaintiff's claim of protected activity.

 It is clear that discharge for exercising rights under the workers' compensation statute falls within the public policy exception to the at-will employment doctrine. *Below v. Skarr*, 569 N.W.2d 510, 511 (Iowa 1997) (citing *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 559–60 (Iowa 1988) and *Smith v. Smithway Motor*

*Xpress, Inc.,* 464 N.W.2d 682, 685 (Iowa 1990)). The scope of protected activity which sufficiently relates to the exercise of workers' compensation rights is less clear. It is not necessary that the plaintiff ever actually file a workers' compensation claim. *Niblo v. Parr Mfg. Inc.,* 445 N.W.2d 351, 353 (Iowa 1989); *see Reedy v. White Consol. Indus.,* 890 F.Supp. 1417, 1433 (N.D.Iowa 1995). In *Niblo* the Iowa Supreme Court held an action would lie if the plaintiff intended or threatened to file a workers' compensation claim, and that the threat or intent need not be expressed by plaintiff, but could be inferred from the surrounding circumstances. *Niblo,* 445 N.W.2d at 353. There the employee informed the president of the defendant company that her doctor had said a skin condition was . work-related. Later she told the president that she needed goggles, protective cream and continued treatment. The company president became angry, told her he was not going to pay workers' compensation benefits, and fired her on the spot. *Id.* It was enough that the employee reported a work-related injury and the employer thought a workers' compensation claim would follow. *Niblo* signifies that an employee's conduct is protected if it alerts the employer to the employee's need or desire for workers' compensation coverage for a work-related injury. *See Hansen v. Sioux By–Products,* 988 F.Supp. 1255, 1267 (N.D.Iowa 1997). The circumstances must, however, give the employer "reason to believe a workers' compensation claim [is] contemplated" by the employee. *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 455 (Iowa 1989); *see Yockey v. State,* 540 N.W.2d 418, 421 (Iowa 1995) (where employer had no reason to suspect employee would file claim).

The only protected activity in this case would be Coleman's visit to nurse Welton on March 26, 1997 in which he complained of workplace stress and his subsequent visit to the doctor. Interference with an employee's right to seek workers' compensation benefits is apparent when the employee is discharged for filing a claim as in *Springer,* 429 N.W.2d at 562, or because

the employee threatens to file such a claim or reveals his or her intent to do so as in *Niblo,* 445 N.W.2d at 353. The factual context in this case even when viewed favorably to Coleman is much more removed from the pursuit of worker's compensation benefits.

■ An employee's report to an employer of a work-related physical injury may well inform the employer that a workers' compensation claim is likely. *See Hansen,* 988 F.Supp. at 1258, 1266–67. Employers, particularly large ones, are conditioned to the workers' compensation consequences of such events. A complaint of workplace stress, without more, is less likely to inform about the employee's intent to pursue a workers' compensation claim. Work-related mental injuries are compensable only under limited circumstances under Iowa law. The mental injury must be "caused by unusual stress in the work environment." *Dunlavey v. Economy Fire & Cas. Co.,* 526 N.W.2d 845, 853 (Iowa 1995). To qualify as "unusual," the workplace stress must be "of greater magnitude than the day-to-day mental stresses experienced by other workers employed in the same or similar jobs." *Id.* at 857 (quoting *Graves v. Utah Power & Light Co.,* 713 P.2d 187, 193 (Wyo.1986)). The everyday stresses and strains of work life are not compensable. *Id.*

There is no evidence that Coleman's complaints of stress were taken by Welton or those in Swift's management (to the extent that they were aware of them) to involve a work-related injury or, it follows, a prospective workers' compensation claim. The Court understands that in a packing plant the first step in initiating a workers' compensation claim is to see the company nurse or doctor, but the fact remains Coleman said nothing to Welton or others which indicated an intent or desire to pursue such a claim. Indeed, he has never filed such a claim. His subsequent conduct also gave no indication he intended to pursue a claim. He did not follow through

with his doctor's limited treatment advice and returned to work immediately. There is no evidence in the summary judgment record that Coleman's superiors believed the matter would go any further after his return to work on March 26. Coleman had experienced a similar but more serious episode in 1994 which did not result in a workers' compensation claim (though it preceded the Iowa Supreme Court's recognition of mental/mental workers' compensation claims in *Dunlavey*).

The Iowa Supreme Court has been slow to expand the scope of the actionable conduct first recognized in *Springer*. In *Below* the court rejected a claim of interference with an employee's right to pursue workers' compensation benefits based on threatened termination or harassment in part because it would have encouraged "a rash of common-law claims by any potential workers' compensation recipients who claim to have been threatened with termination or subjected to any other form of harassment in the workplace by simply asserting that it was retaliatory in nature." 569 N.W.2d at 512. In *Yockey* the court noted a distinction between discharge for filing a workers' compensation claim and discharge for absences occasioned by a work-related injury, and quoted New York case authority against a broad rule imposing liability for discharge because of work-related injury absences. 540 N.W.2d at 421 (quoting *Duncan v. New York State Devel. Center*, 63 N.Y.2d 128, 481 N.Y.S.2d 22, 24, 470 N.E.2d 820, 822 (1984)). It has yet to extend *Springer* to the latter situation. *Id.; see Graves v. O'Hara*, 576 N.W.2d 625, 629 (Iowa App.1998). These cases suggest the court would require a discharge to have a closer connection to the exercise, or intended exercise of workers' compensation rights than the undisputed evidence in Coleman's case presents.

*Causation.*

■■■ "The causation standard in a common-law retaliatory discharge case is high." *Teachout*, 584 N.W.2d at 301. The employee's protected activity "must be the *determinative* factor in the employer's de-cision to take adverse action against the employee." *Id.* (citing *Smithway*, 464 N.W.2d at 686) (emphasis original). A determinative factor is one "which tips the scales decisively one way or the other." *Smithway*, 464 N.W.2d at 686. Under Iowa law, "[p]roof adverse employment action occurs after protected employee conduct, without more, is insufficient to generate a fact question on the determining factor issue." *Weinzetl v. Ruan Single Source Transp. Co.*, 587 N.W.2d 809, 811 (Iowa App.1998) (citing *Phipps v. IASD Health Serv. Corp.*, 558 N.W.2d 198, 203 (Iowa 1997) and *Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992)). In each case in which the Iowa Supreme Court has found sufficient evidence of causation "there was evidence showing a causal connection in addition to the timing of the adverse employment action." *Teachout*, 584 N.W.2d at 302.

■■■ Assuming that Coleman did not resign and was in fact discharged, *see infra*, there is nothing connecting the discharge to his March 26, 1997 complaint of work-related stress other than the temporal relationship between the two events. If that relationship were close enough, it might permit an inference of determinative retaliatory motive. *Hansen*, 988 F.Supp. at 1268. The problem for Mr. Coleman on this summary judgment record is that not only is there no other evidence his complaints of stress were a motivating factor, but there is substantial undisputed evidence of a different reason for his discharge; his absence from work on and after April 4, 1997.

The jury could find from the evidence that Coleman did not resign and that Cosselman could not have reasonably understood from his conversation with Coleman on the evening of April 3, 1997 that he had done so. A jury could find instead that Cosselman seized on Coleman's ambiguous statement about quitting to tend to his ill father in order to bring about a termination of employment because Coleman had taken time off against Cosselman's

wishes. The record is unclear about what Cosselman knew about Coleman's complaints of stress in 1994 or on March 26, 1997. However, Feeback talked to Coleman in Welton's office on March 26 and probably reported to Cosselman what Welton's notes reflect Coleman told Feeback, that he was have trouble dealing with things and needed to see his doctor. (Welton notes at 0165). Plant manager Weber knew from his conversation with Coleman on March 26, that Coleman was having trouble coping and had asked if he could be moved to a different area of the plant. (Coleman Depo. at 132). Coleman testified Weber was understanding and co-operative. (*Id.* at 132–33). Beyond this knowledge of Coleman's feelings of stress, Coleman's dealings with plant management in the persons of Weber, Cosselman, Feeback and Harris from March 26 to and including April 10 when he came in to pick up his pay check, involved only his attempt to take April 4 off to be with his family and vacation the following week. It is clear there was a dispute with Cosselman and Feeback about Coleman's authorization to be absent on those dates. There is no evidence Coleman experienced any difficulties after March 26 until the dispute arose. Harris investigated Coleman's claim that he had not resigned. All of the information he gained related to the question of whether Coleman resigned or abandoned his job. The temporal relationship between Coleman's complaints of stress and his termination does not support an inference that the former was a determinative factor in his termination in light of the uncontradicted evidence of a different, intervening motive for his termination.

There is plenty of evidence in the record that Cosselman was difficult to work for and very demanding. Coleman's descriptions of Cosselman as unfair and hard-hearted concerning his need for time off to be with his father would be shared by many. Coleman's discharge, however, does not provide the basis for a lawsuit unless it was unlawful or in violation of public policy. *See Tullis v. Merrill*, 584 N.W.2d 236, 238 (Iowa 1998); *Lockart v.*

*Cedar Rapids Community Sch. Dist.*, 577 N.W.2d 845, 846 (Iowa 1998).

Swift's motion for summary judgment on unlawful discharge will be granted. The Court concludes a reasonable fact finder could not find that Coleman suffered adverse employment action in retaliation for having exercised his rights under Iowa workers' compensation laws.

### B. Fraudulent Misrepresentation

Plaintiff also claims that Swift fraudulently misrepresented to him that he had resigned. To establish a claim for fraudulent misrepresentation, plaintiff must prove the following elements: "(1) Representation; (2) Falsity; (3) Materiality; (4) Scienter; (5) Intent to deceive; (6) Reliance; and (7) Resulting injury and damage." *Arthur v. Brick*, 565 N.W.2d 623, 625 (Iowa App. 1997). "[T]he representation must 'relate to a material matter known to the party . . . which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances.'" *Clark v. McDaniel*, 546 N.W.2d 590, 592 (Iowa 1996) (quoting *Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987)) (quoting in turn *Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286, 293 (Iowa 1975)). It is difficult to quarrel with the logic of Swift's argument:

> [p]laintiff knows the truth as to whether he either quit or did not quit. If he did quit, then there is no basis for fraud because the representation is true. If plaintiff did not quit, he knew that he did not quit. He could not have justifiably relied on a statement he knew was false. Without justifiable reliance no fraud claim can exist.

Swift's Brief in Support of Motion for Summary Judgment at 4. Plaintiff does not detail in his petition or in the summary judgment record what he did in reliance upon this statement or how he was injured

by Swift's description of his termination as a resignation.

## IV.

Swift has shown that there is no genuine issue of material fact and that defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment is granted. It follows that plaintiff's cross-motion for summary judgment is denied. The Clerk shall enter judgment dismissing the complaint.

IT IS SO ORDERED.