# IN THE COURT OF APPEALS OF IOWA

No. 21-0416
Filed June 15, 2022


**BYRON KUEHL,**
    Plaintiff-Appellant,

**vs.**

**TEGRA CORPORATION and DOUGLAS PALMER and JAMES PALMER, Individually and in their Corporate Capacities,**
    Defendants-Appellees.
_____


    Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary, Judge.


    Byron Kuehl appeals a summary judgment ruling. **AFFIRMED.**


    Mark D. Sherinian and Emily E. Wilson of Sherinian & Hasso Law Firm, Des Moines, for appellant.

    Michele L. Brott and Margaret A. Hanson of Dentons Davis Brown PC, Des Moines, for appellees.


    Heard by May, P.J., and Greer and Chicchelly, JJ.

**MAY, Presiding Judge.**

Byron Kuehl brought an action for wrongful termination against his former employer, Tegra Corporation (Tegra); its president, Douglas (Doug) Palmer; and its vice-president, James (Jim) Palmer.[1] Kuehl appeals the district court's rulings that (1) an email exchange with the defendants' counsel was not admissible and (2) the defendants were entitled to summary judgment. We affirm.

**I. Background Facts and Prior Proceedings**

The following facts are undisputed.

In 2015, Kuehl began working for Big Soo terminal (Big Soo), which is owned by Tegra. Big Soo is a "barge, rail[,] and truck terminal engaged in warehousing and distribution." While at Big Soo, Kuehl worked as the assistant manager. As assistant manager, Kuehl's duties related to operations and personnel management, including coordinating safety and providing safety materials. Kuehl felt responsible for safety. He considers himself a safety expert.

Kuehl reported directly to general manager Kevin Knepper, who had been employed by Big Soo since 1983. Jim and Doug intended for Kuehl to learn the business and take over the general manager role when Knepper eventually retired.

On March 28, 2018, Kuehl was away from the terminal at a safety conference. That day, Knepper directed some employees, including Brian McCormick, to move some rail cars. But the rail cars collided with some stationary

---

[1] We will refer to Tegra, Doug, and Jim individually as needed throughout this opinion. Our references to "the defendants" are to Tegra, Doug, and Jim collectively.

cars. McCormick died in the accident. Kuehl was upset about McCormick's death because they were friends. So Kuehl requested counseling, and Tegra paid for it.

Following the accident, the Iowa Occupational Safety and Health Administration (IOSHA) conducted an investigation. IOSHA interviewed Kuehl along with four other Big Soo employees in March and April as a part of the investigation. Kuehl spoke out about Big Soo during his interview. However, the IOSHA interviews were confidential.

On August 6, Doug, Jim, Knepper, and Kuehl met with the director of IOSHA, and the director was angry. Following the meeting, Doug wondered what the employees said during their interviews with IOSHA. Doug believed an employee or employees gave "bogus" information during the investigation. After that, Kuehl was afraid that if he reported something to IOSHA, it would jeopardize his career.

Following McCormick's death and the IOSHA investigation, Big Soo changed its approach to workplace safety. Kuehl made several suggestions on how to improve safety, and many of those suggestions were implemented. On Kuehl's recommendation, Big Soo appointed a new safety manager. Big Soo started to hold "Safety 10" meetings to address safety concerns. It drafted new safety policies and increased employee safety training. Big Soo also promoted a new safety compliance officer on Kuehl's suggestion. And Big Soo held weekly "Toolbox Talks" to discuss safety. Tegra also hired a safety consultant. The safety consultant recommended Big Soo develop a more strategic approach to establish a sustainable safety culture and suggested a four-step plan to achieve that goal.

During his work with the company, the safety consultant never saw management reject or resist a safety initiative.

Meanwhile, the relationship between Knepper and Kuehl soured following McCormick's death. Kuehl was upset with Knepper because he believed McCormick's death occurred because he was following a directive from Knepper. Kuehl found it difficult to respect Knepper because of his perception of Knepper's approach to safety. Communication between the two men was largely limited to email communication. In summer 2018, an employee who reported to both Knepper and Kuehl told Jim there was a problem between the two men. At another point, a different employee stated it was difficult to show respect to both Knepper and Kuehl because one would have to hope Kuehl wouldn't hold it against them. At some point, Kuehl referred to Knepper as "numb nuts" and "blockhead."

By November, Kuehl talked to Jim and Doug about the ongoing tension between himself and Knepper. Doug told Kuehl it was "time to knock the icicles off" his relationship with Knepper. Doug believed Kuehl was "wallowing in the accident." And Jim made it one of his three main goals for 2019 to improve Kuehl and Knepper's relationship. So he decided to start regular one-on-one meetings to work towards that goal.

But in January 2019, Knepper emailed Doug and Jim to inform them that Kuehl

> has been unwilling to speak to me other than to get absolute critical information or to point out my shortcomings. All of his conversations with me have been terse. It is no secret that I hate conflict. I will do most anything to avoid it until things go too far and I blow-up, but I am working on that. So, I have passively accepted the way [Kuehl] is treating me. [Kuehl] and [I] will need to work closely developing and implementing the safety program. A management transition will

require open dialog. Neither of these components will succeed in the current state of communication between [Kuehl] and [me]. We have to address this and act on it now. We have too much going and too much at stake. I am willing to do whatever it takes for [Kuehl] and [myself] to move into an acceptable working environment. We don't have to carry-on with small talk but we need to be able to work together with unimpeded communication as we transition together. [Kuehl] needs to grasp this concept or something like it. I am open to discuss any options.

At the end of February, Knepper emailed Kuehl stating:

You have not spoken to me, (if you speak to me at all) in a civil tone for months. You have made it very difficult for me to communicate with you. I am seeing a therapist to help me with issues. We talk about you not talking to me a lot. He suggested a conflict management tool, Feelings, Facts and Environment. I have been working on laying this out for a few months. I can't kick this down the road any longer.

Kuehl responded, "You claim I've made it difficult for you to communicate with me yet this is the first attempt you've made to address a situation that began over (11) months ago. I've never denied you a chance to discuss this." Knepper responded

Sometime after that you stopped talking to me at all. I took that as a stay clear from you. So I have. I mentioned that I am not good at dealing with conflict. It has taken me 11 months to get to this point where we can effectively implement the safety program and the transition of me retiring.

Kuehl informed Knepper, "I have quite the laundry list of things that you need to hear from me man to man. This will not be pleasant and isn't the kind of thing that should be emailed. I'll let you know when I'm ready to discuss." Then Kuehl emailed Jim stating that his latest email to Knepper was "unintentionally rude and demanding" and requested Jim arrange a meeting for them with a mediator.

Kuehl also met with Jim multiple times. They discussed the timeframe for safety improvements, and Kuehl informed Jim of times Knepper failed to wear safety glasses, carry a radio, or announce himself. He also informed Jim that

Knepper operated new equipment without proper training and did not enforce safety rules.

Kuehl recommended mental-health therapist Carolyn Phillips to Jim for counseling between Kuehl and Knepper. So Jim hired Phillips to help with Knepper and Kuehl. Phillips met with Kuehl two times, Knepper one time, and both men together one time. Following the sessions, Phillips reported to Jim that Kuehl felt he needed to limit his communication with Knepper to emails. And when face-to-face communication was necessary, Jim would also need to be present.

On May 3, an employee texted Kuehl about work he was uncomfortable completing due to the height of the work. Kuehl went to observe the work and noted the employee was wearing one safety lanyard. Kuehl then sent an email about the work to Knepper. Kuehl also photographed the work and then took the employee a second safety lanyard. A few days later, Kuehl emailed Knepper about the work and described it as a "near miss" and that he believed that "peoples' lives [were] in jeopardy." Knepper forwarded the email to Jim and Doug stating in part, "Guys, I can't continue to work like this. I am nearly sick to my stomach every time I drive to work or even think about encountering [Kuehl]."

Also in May, Kuehl requested a $12,000 raise.[2] At the end of the month, Jim and Doug met with Kuehl. They offered Kuehl an immediate $4000 raise and an additional $8000 if certain learning goals were met in the next sixty to ninety days. Five learning goals were provided to Kuehl including one requiring him to not "trash talk" Knepper at an upcoming conference. Based on Kuehl's body

---

[2] Kuehl had already received a four percent raise in January.

language, Doug believed Kuehl was agitated by the proposal.[3] Kuehl did not immediately accept the offer and instead decided to consider it. They all agreed to meet again on June 4 to discuss the proposal.

Jim and Doug became concerned Kuehl would issue them an ultimatum requiring them to choose between himself and Knepper.[4] So they obtained a severance agreement from their attorney in the event Kuehl did not accept their terms.

Kuehl arrived at the June 4 meeting with prepared remarks and a list of his accomplishments, which he read aloud. Kuehl requested that they discuss the timeline for his transition to general manager and wanted to know if one of the company's customers told them that he was trash-talking Knepper. He also stated he believed the requirement that he not trash-talk Knepper amounted to "a personal attack," which he characterized as "[a]n unfounded concern" that "hardly seems part of a performance evaluation, let alone a basis to refuse a raise request." Jim was concerned who Kuehl would blame or shun next. So Jim told Kuehl he did not see how they could move forward together. Jim handed Kuehl the severance package even though Kuehl never issued an ultimatum.

In October, Kuehl brought this action for wrongful termination in violation of public policy. Specifically, Kuehl alleged he had been terminated because he reported safety violations in violation of the "public policy articulated in" Iowa Code section 88.1 (2019). Because Kuehl intended to introduce email communication

---

[3] Kuehl agrees Doug described him in this way but denies Doug's description of his behavior.

[4] Kuehl claims their concerns were not reasonable.

between Doug and Tegra's attorney, Kuehl moved for an advanced ruling on the admissibility of the evidence. Kuehl argued (1) the communication did not amount to legal advice, (2) Doug waived attorney-client privilege by forwarding the email thread to Kuehl and Knepper, and (3) the court should apply the crime-fraud exception to conclude the communication is not privileged. For their part, the defendants argued the emails were protected by attorney-client privilege. The defendants also moved for summary judgment. The district court heard oral argument on both matters but issued separate rulings. The court determined the email communication was protected by attorney-client privilege. The court also granted the defendants' motion for summary judgment.

Kuehl appeals both rulings.

## II. Email Communication

We begin by considering Kuehl's arguments regarding the admissibility of Doug's email communication with Tegra's attorney.[5]

### A. Scope and Standard of Review

"Our standard of review for a ruling on a statutory evidentiary privilege is for the correction of errors at law." *State v. Weeks*, No. 13-1231, 2014 WL 5243359, at *2 (Iowa Ct. App. Oct. 15, 2014) (citing *State v. Anderson*, 636 N.W.2d 26, 30 (Iowa 2001)). "Our standard of review for the admissibility of evidence alleged to be privileged is for an abuse of discretion." *Id.* (quoting *Anderson*, 636 N.W.2d at

---

[5] We note there is no dispute an attorney-client relationship existed between Tegra (or Doug as Tegra's president) and counsel who represented Tegra during the IOSHA investigation.

30). "There is an abuse of discretion when the court's discretion is exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.*

## B. Discussion

"Iowa law has long recognized the common law privilege against the disclosure of confidential communications between attorney and client." Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.502:1 (Nov. 2021 Update) [hereinafter Doré]. "Stated simply, the privilege permits a client to refuse to disclose and to prevent any other person from disclosing confidential communications made by the client to procure legal advice or legal services from an attorney." *Id.* This privilege is codified in Iowa Code section 622.10. It provides:

> A practicing attorney . . . who obtains information by reason of the person's employment . . . shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline.

Iowa Code § 622.10(1).

### 1. For the purpose of legal advice

Kuehl first argues that the email thread is not protected by attorney-client privilege "because it was not made for the purpose of receiving legal advice." *See* Doré § 5.502:2 ("[I]n order for an attorney-client relationship to fall within the privilege, the consultation with the lawyer must be made with the contemplation of securing legal advice or representation. . . . It is generally accepted that the communications from the attorney to the client will also be encompassed by the privilege, at least where the communications would directly or indirectly reveal the confidences of the client."). The email thread related to the August 6, 2018 meeting

with the IOSHA director. Kuehl notes the meeting itself was not confidential. So, he reasons, the subsequent communication discussing the meeting was not necessarily for the purpose of securing legal advice. And he notes Doug initially stated in his deposition that he "never thought of it as legal advice."

However, we have reviewed the email thread and conclude the communication was made for the purpose of receiving legal advice. In the first email, Doug listed what he perceived as inaccuracies from the meeting and asked what the next steps will be. Counsel responded with an answer. Then Doug inquired about an IOSHA timeline, which counsel confirmed. This communication was all about the IOSHA investigatory process for which counsel was representing Tegra.

*2. Waiver*

Next, Kuehl argues Doug waived any privilege by forwarding the email thread to Knepper and Kuehl. However, privilege is not waived when it is "not disseminated beyond those persons who, *because of the corporate structure, need to know its contents*." *Keefe v. Bernard*, 774 N.W.2d 663, 672 n.9 (Iowa 2009) (quoting *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1978)). Kuehl contends that the emails contained no information that Knepper and Kuehl needed to know. We disagree. Both Knepper and Kuehl were a part of the IOSHA investigation and attended the August 6 meeting. The email thread informed them what would happen next and when to expect another IOSHA inspection at Big Soo—critical information for the Big Soo general manager and assistant manager who headed up safety at the terminal. So we conclude Doug did not waive the attorney-client privilege by forwarding the email thread to Knepper and Kuehl.

### 3. Crime-fraud exception

Finally, Kuehl argues we should extend the crime-fraud exception to torts and conclude it applies to this case. "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or a crime." *United States v. Zolin*, 491 U.S. 554, 563 (1989) (citations omitted). "Because the attorney-client privilege benefits the client, it is the client's intent to further a crime or fraud that must be shown." *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001).

Kuehl asserts the crime-fraud exception would apply here because Doug allegedly forwarded the email thread "in retaliation for [Kuehl's] interview with [IOSHA] in violation of Iowa Code [section] 88.9(3)."[6]   Kuehl claims that—by forwarding the email thread—Doug made Kuehl aware that Kuehl's cooperation with IOSHA would not be tolerated and "communicated that if Kuehl complained outside of Tegra again, he would be terminated." But as the defendants point out, Kuehl has presented no evidence besides his own speculation that Doug intended to warn Kuehl against cooperation with IOSHA or making external complaints. *See Zolin*, 491 U.S. at 564.

So even if we were to extend the crime-fraud exception to tort actions, it would not apply here. Moreover, we think it best to leave any expansion of the crime-fraud exception to our supreme court. *Cf. Rosauer Corp. v. Sapp Dev.,*

---

[6] Iowa Code section 88.9(3)(a)(1) provides, "A person shall not discharge or in any manner discriminate against an employee because the employee . . . has testified . . . in any such [IOSHA] proceeding."

*L.L.C.*, 856 N.W.2d 906, 907 (Iowa 2014) (finding it appropriate for the court of appeals to defer to the supreme court on whether to extend "implied warranty of workmanlike construction").

**III. Summary Judgment**

Finally we address Kuehl's challenge to the summary judgment ruling dismissing his wrongful-discharge claim.

### A. Scope and Standard of Review

"We review summary judgment rulings for correction of errors at law." *Roll v. Newhall*, 888 N.W.2d 422, 425 (Iowa 2016). Summary judgment is appropriate when the file shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "We review the evidence in the light most favorable to the nonmoving party." *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007).

### B. Discussion

Kuehl claims the district court erred in granting summary judgment because a jury could find that his "participation in the [IOSHA] interview and/or [his] repeated internal safety complaints were the determining factor in his termination." The defendants retort, "Summary judgment is not a rehearsal; it was [Kuehl]'s time to 'put up' his evidence not mere allegations of a conspiracy premised on speculation and attorney argument."

Kuehl claims he was wrongfully discharged in violation of public policy. To establish such a claim, Kuehl must establish: "(1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two." *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 300 (Iowa 1998).

Only the third element is in dispute. "The causation standard in a common-law retaliatory discharge case is high." *Id.* at 301. To establish a causal connection, a "plaintiff must show the protected conduct was the determining factor in the adverse employment action." *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 898 (Iowa 2015). "[A] determining factor is one that tips the balance in an employment decision." *Id.* "In order to be the determining factor, it is not necessary the protected conduct be 'the main reason behind the decision,' but it must be the factor that makes the difference in the employment outcome." *Id.* (citation omitted). So we examine the evidence to determine whether a reasonable fact finder could conclude that either Kuehl's participation in the IOSHA investigation or his safety recommendations were the determinative factor in Tegra's decision to terminate him. *See Teachout*, 584 N.W.2d at 302.

Kuehl points to a statement Jim purportedly made shortly before Kuehl's termination wherein Jim said he was concerned he would also end up "sideways" with Kuehl should another workplace accident occur. He highlights Jim's concern that Kuehl would "trash talk" Knepper at a trade conference. He claims these statements give insight to Jim's thinking. To the extent these statements provide any insight, though, they do not provide support for Kuehl's wrongful discharge theory. Instead, if anything, they demonstrate Jim was concerned Kuehl was combative and held animosity against his co-workers.

Kuehl also points to his concerns about the "near miss" on May 3, 2019, and other times he reported safety issues. He claims the defendants were not receptive to his concerns. But Kuehl does not provide any evidentiary support for his assertion. To the contrary, the record shows that the defendants were

receptive to Kuehl's safety suggestions and implemented policies to address his concerns.

He also notes Doug told him it was "time to knock the icicles off" his relationship with Knepper. Kuehl contends his relationship with Knepper was deteriorating due to his continued safety concerns. And to the extent he was terminated due to his poor relationship Knepper, the root cause of the poor relationship was Kuehl's continued safety concerns. So he reasons they are "two sides of the same coin." But we think this claim ignores the obvious: the relationship was deteriorating due to the manner in which Kuehl communicated his safety concerns. He was the one who required communication be through email or in the presence of the company vice-president. He was the one who called Knepper names like "numb nuts" while at work.[7] Kuehl cannot dress up insubordination as protected conduct to immunize himself from negative repercussions for his actions.

With respect to Kuehl's participation in the IOSHA investigation, we agree with the district court that Kuehl cannot establish causation between his interview and termination. Because the content of Kuehl's interview was confidential, the defendants had no idea that Kuehl spoke out against Big Soo or its safety practices. *Cf. Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 289 (Iowa 2000) ("[I]f the employer has no knowledge the employee engaged in the protected activity, causation cannot be established."). Nor did the defendants take steps to

---

[7] Kuehl complains that Knepper wasn't also blamed for going along with his preferred communication method and Knepper did not take affirmative steps to reconcile with Kuehl between March 2018 and February 2019. But we do not think that creates a fact issue as to causation.

try to discover the content of Kuehl's interview. And Kuehl provides nothing more than conjecture to suggest the defendants suspected him as the source of possible "bogus" information provided during the investigation.

Considering the evidence in the light most favorable to Kuehl, we conclude he failed to provide any evidence for a reasonable fact finder to conclude Kuehl's participation in the IOSHA investigation or his ongoing safety concerns were the determinative factor in his termination. So we conclude the district court correctly granted summary judgment.

**AFFIRMED.**