# IN THE SUPREME COURT OF IOWA

No. 11–2100

Filed August 2, 2013

**KAREN DORSHKIND,**

    Appellee,

vs.

**OAK PARK PLACE OF DUBUQUE II, L.L.C.,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

An employee and an assisted living facility seek further review of a court of appeals decision affirming a judgment for wrongful termination and reversing a judgment awarding punitive damages. **DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND VACATED IN PART, AND REMANDED WITH DIRECTIONS.**

Thomas D. Wolle of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, and Thomas R. Crone of Melli Law, S.C., Madison, Wisconsin, for appellant.

Mark L. Zaiger and Drew Cumings-Peterson of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellee.

Ryan G. Koopmans of Nyemaster Goode, P.C., Des Moines, for amicus curiae Iowa Association of Business and Industry.

**WIGGINS, Justice.**

In this appeal, we must decide if an internal complaint by an employee against an assisted living facility concerning forged training documents, which the state mandates, gives rise to a wrongful-termination action. The district court determined a wrongful-termination suit lies and submitted the case to the jury. The jury returned a verdict against the assisted living facility for actual and punitive damages. The facility appealed. We transferred the case to the court of appeals. The court of appeals affirmed the actual damages claim but reversed on the punitive damages issue. Both parties asked for further review, which we granted. On further review, we affirm the decision of the court of appeals (1) because the employer's retaliatory discharge of an at-will employee, who internally reported her employer's forgery of state-mandated training documents, violated public policy; and (2) because punitive damages are not recoverable, due to the fact that at the time of the employee's wrongful discharge we did not recognize a public-policy exception to the at-will employment doctrine based upon a violation of administrative rules. Accordingly, we remand the case to the district court to enter judgment consistent with our decision.

### I. Facts and Prior Proceedings.

**A. Facts.** This appeal arose from the district court's denial of a motion for directed verdict. Accordingly, we review the facts in the light most favorable to the party against whom the motion for directed verdict was made. Iowa R. App. P. 6.904(3)(*b*); *Fly v. Blauvelt*, 818 N.W.2d 123, 134 (Iowa 2012). Because Oak Park made the motion for directed verdict, we review the facts in the light most favorable to Karen Dorshkind.

Oak Park Place in Dubuque is an assisted living facility. Alternative Continuum of Care owns the Dubuque facility, as well as a network of other assisted living homes all named Oak Park. Headquarters for the company is in Madison, Wisconsin.[1]

Oak Park contains 131 beds and has fifty-five employees who provide patients with several different levels of care. The lowest level of care includes the administration of medications, assistance with bathing and dressing, and help with mobility to and from meals.

Oak Park is also certified as a dementia-specific assisted living program. This means the facility holds itself out as providing specialized care in a dedicated setting for patients with dementia but may also provide care to patients without cognitive disorders. In late 2008, Oak Park had approximately thirteen patients in its dementia program.

Because Oak Park includes a special unit for its patients suffering from dementia, Oak Park is subject to the provisions in Iowa Code chapter 231C (2007) and the Iowa Administrative Code rule 321—25.34(1) (2006),[2] which require direct care staff to complete dementia-specific training. Forgery of documents certifying completion of this training constitutes a violation of law. *See* Iowa Code § 231C.14(1), (3) (imposing civil penalties for noncompliance with regulations and interfering in any way with an Iowa Department of Inspections and Appeals (DIA) representative). The DIA is responsible for enforcing these provisions. Iowa Admin. Code r. 321—26.3.

---

[1]References hereafter in the opinion to "Oak Park" refer only to the Dubuque facility, unless specifically stated otherwise.

[2]The rules pertaining to elder care in the Iowa Administrative Code have been restructured since 2008. These rules are now located under the Iowa Department of Inspections and Appeals (Agency 481) in chapter 69. *See* Iowa Admin. Code r. 481—69.30(1)–(5).

Dorshkind worked at Oak Park from April 10, 2006, to September 5, 2008. Dorshkind was hired as an at-will employee for the position of sales and marketing assistant. About six months later, Oak Park promoted her to marketing director. Dorshkind's primary responsibility was to increase the number of patients at Oak Park.

For the first two years of her employment, Dorshkind's supervisor was Marthe Jones, the regional marketing director. Thereafter, in April 2008, Dorshkind began reporting to Tim Hendricks, the housing director for Oak Park. Hendricks reported to Toni Carruthers, the regional director of operations. Carruthers, in turn, was supervised by Scott Frank, the CEO and majority owner of the Oak Park network.

During an unannounced inspection by the DIA on July 24, 2008, Dorshkind witnessed what she believed to be her supervisor, Hendricks, and the supervisor of the certified nursing assistants at Oak Park, Kristi Niemer, falsifying state-mandated training documents for the dementia program. Dorshkind testified that she witnessed Niemer making copies of test papers and then later saw Niemer with Hendricks in his office with some stacks of paper. Niemer was filling out answers to what appeared to be true or false questions. Hendricks had another pile of papers and was writing on them. A different stack of papers was stamped "post-test" at the top. Eyewitnesses testified that the two did not attempt to hide what they were doing. Instead, Hendricks and Niemer told other employees that their acts were going to "save the day for Oak Park."

Dorshkind left Hendricks' office and returned to her own. Pat True, the director of maintenance at Oak Park, later came by and said he had also seen Niemer and Hendricks forging training documents. True had been called into Hendricks' office to sign a paper. At that time, he observed the two forging other employees' names. True told Hendricks

he should at least use different colored pens to vary the signatures he was forging on the documents. Hendricks later laughed and recounted the comment to Denise Schiltz, the director of nursing at Oak Park, who also witnessed the incident.

Schiltz told Dorshkind she had seen Hendricks and Niemer forging staff names on the dementia training documents. During testimony, Schiltz said that none of the training certified in the documents ever occurred. Schiltz realized Hendricks and Neimer's conduct constituted forgery and immediately submitted her resignation on July 24.

For obvious reasons, Dorshkind did not report these concerns to her then-supervisor, Hendricks. Approximately six weeks after the incident, Dorshkind called Jones, her former supervisor who was then working as the marketing director in Madison, which was not a supervisory position and did not involve human resources responsibilities. Jones described her relationship to Dorshkind as a coworker or peer. Jones admitted that at the time of the report, there was no supervisor–subordinate relationship between her and Dorshkind.

Dorshkind told Jones about the suspected forgery. During her testimony, Dorshkind explained her rationale for doing so as follows: "Well, my concern was, number one, for the residents. If tests had been falsified, I felt that meant that the staff hadn't had the training. My first concern was always the residents." Dorshkind was also concerned Oak Park would lose its license. While speaking with Jones, Dorshkind additionally communicated her belief that two employees, including her supervisor, were having an extramarital affair.

When testifying regarding her conversation with Jones, Dorshkind stated that Jones asked Dorshkind if she wanted Jones to talk to Tara Klun, the director of human resources for Oak Park at the Madison

headquarters. Jones testified, "I said, Karen, I don't know what to do. Would you like me to go to human resources and talk to them and see what path you should take?" Later, Jones added, "I told [Dorshkind] I would talk to Tara Klun and ask her what she should do in this situation."

Dorshkind believed the internal report was a collaborative effort, even though Jones said she was the first one to raise the question of whether it should be reported to Klun. Dorshkind had gone to Jones to get "Marthe's advice." However, Dorshkind testified that Jones believed her going to Klun "would be the best way that we can handle any situation."

Jones spoke with Klun on September 3. Klun testified that "she understood at the time that Ms. Dorshkind and Ms. Jones had just completed a telephone call before [Jones] came into [Klun's] office to talk." During Jones's conversation with Klun, Jones reported, "Karen Dorshkind called me today" and said "Kristi and Tim were falsifying documents." Jones specifically stated that the "falsification that had occurred," as well as "an illicit personal relationship," "[wa]s reported by Ms. Dorshkind." Jones said, "[W]e [meaning Dorshkind and Jones] don't know what to do."

Klun informed the CEO of both allegations. Klun testified that if an employee has a problem and wants to make a report, the employee "would follow the chain of command and go to their supervisor, and if they didn't feel comfortable, to the next level and/or human resources."

On September 4, 2008, Klun and Carruthers went to Oak Park to investigate the claims. Immediately when Klun arrived, Dorshkind approached her and said, "Tara, I'm glad you're here. Can I talk to you alone[?]" Klun responded, "not now . . . let's wait until we can talk in

private." Klun never spoke with Dorshkind privately to inquire about what she knew regarding the allegation, which Klun admits, "that she reported." During her testimony, Klun explained her rationale for not approaching Dorshkind as follows:

> I believe that she would not have anything further than what Marthe Jones shared with me, for she shared the full conversation that she had with Karen. And at the time I did not feel that she would give me any new information on the 4th of September.

Klun later reiterated on cross-examination that she believed Jones "shared with me the entirety" of Dorshkind's information regarding the allegations. Jones was the first person who reported the forgery to Klun.

After conducting a two-day investigation, both Klun and Carruthers concluded there was no validity to Dorshkind's report of forgery and an affair. Klun later admitted that her investigation of the forgery allegations was "very poor."

The following day, Oak Park terminated Dorshkind's employment. In a letter signed by Klun and Carruthers, the basis for the termination was stated as follows:

> After a long 2 day and careful investigation, speaking with many individuals, ones you specifically mentioned, we have come to a conclusion that you have not been truthful. Upon the investigation we learned of several incidents where you have not been truthful; spreading rumors regarding a false relationship between two employees, *malicious statements regarding forging of documents*, and false statement to a Regional Director about move in numbers, all with in these two days. This is jeopardizing and affecting the working environment at Oak Park.
>
> Due to the above issues, we are at a point where we are unable to trust you. Therefore, it is in Oak Park's best interest to end the relationship effective immediately.

(Emphasis added.) Jones was also fired.

On September 25 and 29, after receiving a complaint from Schiltz about the incident on July 24, the DIA conducted an on-site investigation at Oak Park. In its final report, the DIA concluded certain state-mandated documents relating to the dementia training program had been forged. Accordingly, the DIA imposed a civil penalty of $10,000 and barred the facility from admitting any new patients while under conditional certification status.

**B. Prior Proceedings.** On September 7, 2010, Dorshkind sued Oak Park for wrongful discharge of employment in violation of public policy. Oak Park responded by filing a motion for summary judgment, arguing no established public policy protects Dorshkind's activity because she did not report the alleged misconduct externally to the DIA, but rather, only internally. Thus, Oak Park urged the district court to find Dorshkind's termination does not jeopardize public policy. Oak Park also alleged there was an overriding business justification for the discharge.

The district court denied the motion. The matter proceeded to a jury trial on November 15, 2011. Before resting, Dorshkind moved the district court to present the issue of punitive damages to the jury. Oak Park resisted, claiming Iowa has not previously recognized the public policy asserted by Dorshkind, and thus, punitive damages are not recoverable. The district court granted Dorshkind's motion and rejected Oak Park's argument. The district court held:

> There is a defined public policy to protect residents in assisted living facilities, particularly those who suffer from dementia. Toward that end, the State requires training to ensure that people with dementia receive proper care and are not abused in any manner. That is the purpose of the regulation.

Accordingly, the district court allowed the question of punitive damages to be submitted to the jury.

Oak Park then moved for directed verdict on the same grounds as the motion for summary judgment. The district court denied the motion without explanation.

The jury returned a verdict for Dorshkind, finding Oak Park terminated her in retaliation for whistleblowing and with a willful and wanton disregard for the rights or safety of others. Accordingly, the jury awarded $178,500 in compensatory damages, including $156,000 in lost pay and benefits and $22,500 in emotional distress damages. The jury award also included $178,500 in punitive damages. The district court entered judgment on November 22.

Oak Park timely filed a notice of appeal. We transferred the case to the court of appeals. The court of appeals affirmed the district court judgment in part by finding the public-policy exception protected Dorshkind's employment from retaliatory termination and consequently, concluded the district court properly denied Oak Park's motion for directed verdict. However, the court of appeals reversed the district court's decision to submit the issue of punitive damages to the jury. The court of appeals held "there has been no specific declaration by our courts or legislature that internal whistleblowing may be protected under certain circumstances."

Both parties sought further review, which we granted.

**II. Issues.**

The first issue is whether an at-will employee, who was discharged by her employer after making an internal report of forgery regarding state-mandated documents certifying dementia training, is protected from retaliatory termination under the public-policy exception to the at-

will employment doctrine. The second issue asks whether an at-will employee who is wrongfully discharged based upon a violation of administrative rules may recover punitive damages.

### III. Standard of Review.

This appeal arises from the district court's denial of a motion for directed verdict. Thus, our review is for correction of errors at law. *Estate of Ryan v. Heritage Trails Assocs., Inc.*, 745 N.W.2d 724, 728 (Iowa 2008). We review the evidence in the light most favorable to the nonmoving party, taking into consideration all reasonable inferences that could fairly be made by the jury, regardless of whether the evidence is contradicted. *Slocum v. Hammond*, 346 N.W.2d 485, 494 (Iowa 1984). Our role on appeal is to decide "whether the trial court correctly determined there was sufficient evidence to submit the issue to the jury." *Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008).

### IV. Analysis.

**A. At-Will Employment.** Employment in Iowa is at will. *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011). Therefore, unless the employee has a valid contract of employment, "the employment relationship is terminable by either party 'at any time, for any reason, or no reason at all.' " *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997)). Yet, the employer's right to discharge an employee under an at-will employment contract may be limited by public policy considerations. *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998).

**B. Public-Policy Exception.** Iowa follows the majority of states by carving out a public-policy exception to the general rule of at-will employment for wrongful-discharge claims. *See Springer v. Weeks & Leo*

*Co.,* 429 N.W.2d 558, 560 (Iowa 1988) (adopting the public-policy exception in Iowa).

Public policy is an elusive legal construct. We have previously said public policy is that which " 'generally captures the communal conscience and common sense of our state in matters of public health, safety, morals, and general welfare.' " *Berry,* 803 N.W.2d at 110 (quoting *Jasper v. H. Nizam, Inc.,* 764 N.W.2d 751, 761 (Iowa 2009)). Another definition includes those matters "fundamental to citizens' social rights, duties, and responsibilities." *Id.* Once identified, the public policy "becomes a benchmark in the application of our legal principles." *Jasper,* 764 N.W.2d at 761.

An employee seeking protection under the public-policy exception in his or her wrongful-discharge claim must prove the following elements:

> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.

*Berry,* 803 N.W.2d at 109–10. The first two elements constitute questions of law to be determined by the court. *Fitzgerald,* 613 N.W.2d at 282. If the discharged employee successfully establishes each of these elements, "he or she is entitled to recover both personal injury and property damage." *Berry,* 803 N.W.2d at 110.

**C. Prior Application of the Public-Policy Exception.** In Iowa, we have recognized many situations where the public-policy exception applies. Below is a selection of cases to illustrate how we have previously implemented the exception.

1. *Enforcing a statutory right.* We have consistently held that an employee cannot be discharged in retaliation for enforcing a statutory right. The first case to do so was *Springer*, 429 N.W.2d 558. There, we held an employer who terminated an employee for filing a workers' compensation claim could be liable for wrongful discharge. *Id.* at 560–61. We reaffirmed *Springer* in three subsequent cases. *See Clarey v. K-Products, Inc.*, 514 N.W.2d 900, 902 (Iowa 1994) (finding sufficient evidence to support a wrongful-discharge jury verdict in favor of a plaintiff terminated after filing a workers' compensation claim); *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 685 (Iowa 1990) (holding even though the discharge did not directly interfere with payment of benefits, the firing violated public policy, because it would chill the assertion of workers' compensation rights and erode the employer's obligation to pay valid claims); *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 353 (Iowa 1989) (deciding there was sufficient evidence to support a jury's verdict finding the plaintiff had been terminated for threatening to file a workers' compensation claim).

We extended the holding in *Springer* to persons who filed for unemployment benefits. *Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994). In extending *Springer*, we reemphasized our language in *Smith* by stating, "Employers cannot be permitted to intimidate 'employees into foregoing the benefits to which they are entitled in order to keep their jobs.'" *Id.* (quoting *Smith*, 464 N.W.2d at 686).

2. *Refusal to participate in illegal activity.* We have two cases allowing a wrongful-discharge claim to proceed when an employee refuses to participate in an illegal activity. The first is *Fitzgerald*, 613 N.W.2d 275. There, we held an employee had a claim for wrongful discharge because he intended to testify truthfully in a legal proceeding,

rather than perjure himself. *Id.* at 285–86. In reaching this conclusion, we cited decisions from other jurisdictions that allowed such claims when an employee refused to commit perjury. *Id.* at 286. Although, Fitzgerald did not testify before his discharge, we said the employee must only show he had a good faith intent to testify truthfully. *Id.* at 287.

The second case to hold a person cannot be discharged for failing to participate in illegal activity is *Jasper*, 764 N.W.2d 751. In *Jasper*, an employee refused to work in an understaffed room at a daycare center, a situation violating the administrative rules issued by the Iowa Department of Human Services. *Id.* at 758–59. The daycare provider then terminated her employment. *Id.* at 759. In determining the appropriate public policy, we looked to the administrative regulations of this state. *Id.* at 765. We found the department adopted the rules for the health, safety, and welfare of children in daycare facilities. *Id.* at 766. Accordingly, we affirmed the jury verdict because Jasper had presented sufficient evidence to establish she was terminated because she refused to violate the administrative regulations. *Id.* at 768.

3. *Whistleblowing.* A third category of cases where we have said discharging an employee violates public policy is whistleblowing. We issued two cases on the same day in September 1998 to discuss this issue. The first matter was *Tullis v. Merrill*, 584 N.W.2d 236 (Iowa 1998). There, Tullis complained internally to the business owner that the company was not paying his insurance benefits as part of his promised wages. *Id.* at 237–38. Tullis claimed this failure to pay wages violated chapter 91A of the Iowa Code. *Id.* at 238. Although Tullis could have filed a complaint with the labor commissioner under Iowa Code section 91A.10, he chose to make a complaint in-house. After doing so, his employer terminated him. *Id.*

He brought a wrongful-discharge action against his employer based on the public-policy exception to the at-will employment doctrine. *Id.* The jury returned a verdict in favor of Tullis's wrongful-discharge claim. *Id.* The employer appealed. *Id.*

On appeal, the employer argued the public-policy exception only applied if the employee made the complaint to the labor commissioner under section 91A.10. *Id.* at 239. The employer claimed the statute only protected an employee who made a complaint with the commissioner. *Id.* The statute provided:

> An employer shall not discharge or in any other manner discriminate against any employee because the employee has filed a complaint, assigned a claim, or brought an action under this section or has cooperated in bringing any action against an employer.

Iowa Code § 91A.10(5) (1995). In response to this claim, we held public policy prohibited Tullis's firing for making a wage claim, and the internal complaint satisfied this public policy. *Tullis*, 584 N.W.2d at 239–40.

The other case filed that day was *Teachout*, 584 N.W.2d 296. There, a teacher's assistant claimed the school terminated her after she reported alleged child abuse to her supervising teacher and orally to the department of human services. *Id.* at 298–99. In *Teachout*, the Code did not expressly protect an employee for making a complaint of child abuse. However, the Code did provide

> [c]hildren in this state are in urgent need of protection from abuse. It is the purpose and policy of this [statute] to provide the greatest possible protection to victims or potential victims of abuse through encouraging the increased reporting of suspected cases of such abuse, insuring the thorough and prompt investigation of these reports.

Iowa Code § 232.67. Therefore, we concluded the public policy of Iowa protects a person discharged by an employer because he or she makes a

good faith complaint of child abuse. *Teachout,* 584 N.W.2d at 300–01. However, we held Teachout failed to establish a jury question on the element of causation; she demonstrated only that her "termination occurred after the District learned she had engaged in a protected activity," not that her conduct was a determinative factor. *Id.* at 302.

Another case dealing with whistleblowing was *Ballalatak v. All Iowa Agriculture Ass'n,* 781 N.W.2d 272 (Iowa 2010). In *Ballalatak,* the employee claimed he was fired for internally complaining that the company was not properly handling a fellow employee's workers' compensation claim. *Id.* at 275. In determining whether a claim existed, we favorably cited an Eighth Circuit Court of Appeals opinion where the federal court determined we would recognize a public-policy exception to the employment at-will doctrine when an employee makes an internal complaint about employee safety. *Id.* at 277 (citing *Kohrt v. MidAmerican Energy Co.,* 364 F.3d 894, 902 (8th Cir. 2004)). We found, however, that the Iowa workers' compensation statutes did not provide a public-policy exception for an internal complaint based on a fellow employee's concern that the employer may not be complying with Iowa's workers' compensation laws. *Id.* at 278.

**D. Application of Legal Principles.** With these principles and jurisprudence in mind, we turn to the case at hand. The jury returned a verdict for Dorshkind. Thus, the jury resolved the factual issues in the third and fourth elements by finding Oak Park discharged Dorshkind because of her whistleblowing and that Oak Park had no overriding business justification for the discharge. Therefore, we need only address the first and second elements, which are legal questions—the existence of a clearly defined and well-recognized public policy that protects

Dorshkind's activity and that Dorshkind's discharge from employment would undermine this public policy.

1. *Clearly defined and well-recognized public policy.* To resolve the issue before us, we must ask whether a clearly defined and well-recognized public policy exists to bar Dorshkind's termination for internal whistleblowing relating to Oak Park's forgery of state-mandated training documents for its dementia program. This is a question of law. *Fitzgerald*, 613 N.W.2d at 282.

We look primarily to our statutes to determine whether an implied or express public policy exists but such policies may also be found in our constitution. *Id.* at 283; *see also Kohrt*, 364 F.3d at 899 (applying Iowa law). The court does not look only to statutes expressly mandating protection for at-will employees. *Fitzgerald*, 613 N.W.2d at 283. "[W]e [also] look to other statutes which not only define clear public policy but imply a prohibition against termination from employment to avoid undermining that policy." *Id.* However, we do not divine public policy from internal company policies or agreements. *Ballalatak*, 781 N.W.2d at 278. Administrative regulations are another source of public policy "when adopted pursuant to a delegation of authority in a statute that seeks to further a public policy." *Jasper*, 764 N.W.2d at 764. Courts in other jurisdictions also recognize professional rules as sources of public policy. *See, e.g.*, *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 523 (Colo. 1996) (holding state-accountancy-board rules may constitute articulations of public policy in case where a CPA was terminated in retaliation for complaining to supervisors about questionable accounting practices).

We cautiously identify policies to support an action for wrongful discharge under the public-policy exception. We do so because

> [a]ny effort to evaluate the public policy exception with generalized concepts of fairness and justice will result in an elimination of the at-will doctrine itself. Moreover, it could unwittingly transform the public policy exception into a "good faith and fair dealing" exception, a standard we have repeatedly rejected.

*Fitzgerald*, 613 N.W.2d at 283 (citations omitted); *accord Lloyd v. Drake Univ.*, 686 N.W.2d 225, 230–31 (Iowa 2004) (rejecting a wrongful-discharge claim lodged by a security guard who was fired after forcibly restraining a student suspected of assault because the asserted public policy against crime is generalized, not "clearly defined"). Thus, the exception is narrowly circumscribed to only those policies clearly defined and well-recognized to protect those with a compelling need for protection from wrongful discharge. *See, e.g.*, *Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 685 (Iowa 2001) (rejecting an independent contractor's claim for wrongful discharge by finding "no compelling need, as we did for at-will employees, to support a wrongful termination tort"). The "well recognized and clearly defined" requirement ensures "employers have notice that their dismissal decisions will give rise to liability." *Fitzgerald*, 613 N.W.2d at 282–83.

We have previously held that an employer cannot discharge an employee because he or she whistleblows if there is a public policy to protect the integrity and employment of those who uphold the law by reporting illegalities in the workplace. *Teachout*, 584 N.W.2d at 300–01. In other words, whistleblowing is an exception to the at-will employment doctrine if the public policy of this state requires protection of the public by ensuring "infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare" are properly reported. *Palmer v. Brown*, 752 P.2d 685, 689 (Kan. 1988) (applying this principle under Kansas law).

We find the Code and our administrative rules support a clearly defined and well-recognized public policy under the exception to the at-will employment doctrine. Chapter 231C, governing assisted living facilities, expressly states the legislature's findings, purpose, and intent in enacting chapter 231C as follows:

> 1. The general assembly finds that *assisted living is an important part of the long-term care continua in this state.* Assisted living emphasizes the independence and dignity of the individual while providing services in a cost-effective manner.
>
> 2. The purposes of establishing an assisted living program include all of the following:
>
> a. To encourage the *establishment and maintenance of a safe and homelike environment* for individuals of all income levels who require assistance to live independently but who do not require health-related care on a continuous twenty-four-hour per day basis.
>
> b. To establish standards for assisted living programs that allow flexibility in design which promotes a social model of service delivery by focusing on independence, individual needs and desires, and consumer-driven quality of service.
>
> c. *To encourage public participation in the development of assisted living programs* for individuals of all income levels.
>
> 3. It is the intent of the general assembly that the department of elder affairs *establish policy for assisted living programs* and that the department of inspections and appeals enforce this chapter.[3]

Iowa Code § 231C.1 (2007) (emphasis added).

---

[3]To ensure the fulfillment of this intent, the legislature provided a procedure for lodging complaints concerning the operation of an assisted living facility. *See* Iowa Code § 231C.7(1) ("Any person with concerns regarding the operations or service delivery of an assisted living program may file a complaint with the department of inspections and appeals."). Moreover, the legislature prohibited retaliation by the assisted living program against an employee "who has initiated or participated in any proceeding authorized by this chapter." *Id.* § 231C.13.

The legislature, by including a findings, purpose, and intent provision in chapter 231C, demonstrated a clearly defined and well-recognized public policy to make assisted living available throughout the state and to ensure the safety of persons residing in assisted living facilities. Other provisions of chapter 231C supporting this public policy include rulemaking authority by the elder affairs department for certification of assisted living facilities and requiring compliance with fire and safety standards. *Id.* §§ 231C.3, .4.

Turning to the administrative rules, we find the legislature clearly authorized the elder affairs department to promulgate rules regarding the certification of assisted living facilities "to ensure, to the greatest extent possible, the health, safety, and well-being and appropriate treatment of tenants." *Id.* § 231C.3(1)(*a*). Specifically, "[t]he department may also establish by rule in accordance with chapter 17A minimum standards for . . . dementia-specific assisted living programs." *Id.* § 231C.3(6).

At the time of Dorshkind's report and discharge, the administrative rules stated:

> **25.34(1)** All personnel employed by or contracting with a dementia-specific program shall receive a minimum of six hours of dementia-specific education and training prior to or within 90 days of employment or the beginning date of the contract.
>
> **25.34(2)** The dementia-specific education or training shall include, at a minimum, the following:
>
> *a.* An explanation of Alzheimer's disease and related disorders;
>
> *b.* The program's specialized dementia care philosophy and program;
>
> *c.* Skills for communicating with persons with dementia;

*d.* Skill for communicating with family and friends of persons with dementia;

*e.* An explanation of family issues such as role reversal, grief and loss, guilt, relinquishing the care-giving role, and family dynamics;

*f.* The importance of planned and spontaneous activities;

*g.* Skills in providing assistance with instrumental activities of daily living;

*h.* The importance of the service plan and social history information;

*i.* Skills in working with challenging tenants;

*j.* Techniques for simplifying, cueing, and redirecting; and

*k.* Staff support and stress reduction.

**25.34(3)** All personnel employed by or contracting with a dementia-specific program shall receive a minimum of two hours of dementia-specific continuing education annually.

**25.34(4)** An employee who provides documentation of completion of a dementia-specific education or training program within the past 12 months shall be exempt from the education and training requirement of subrule 25.34(1).

Iowa Admin. Code r. 321—25.34(1)–(4).

Thus, the administrative rules specifically articulated a concern for the health, safety, and welfare of dementia patients in assisted living facilities. Acting on this concern, the elder affairs department required the implementation of a training program with accompanying state-mandated training documents to safeguard dementia patients' health, safety, and welfare.

In *Teachout*, we found language in a statute similar to the language in chapter 231C and the administrative rules promulgated under chapter

231C supported a public policy that made the reporting of child abuse a protected activity. 584 N.W.2d at 300–01; *see also Trombetta v. Detroit, Toledo & Ironton R.R.*, 265 N.W.2d 385–88 (Mich. Ct. App. 1978) (stating, in dicta, that it would have been impermissible for the employee to be discharged for refusing to falsify pollution control reports that are required to be filed with the state). As in *Teachout*, based on the plain language found in the statutes and rules, we find a strong public policy to ensure the proper care of dementia patients.

We should not allow an employer to ignore the substance either of a statute or administrative regulation or the statement of public policy that it represents. "There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 879 (Ill. 1981). Accordingly, we find Dorshkind's whistleblowing, which involved reporting violations of law that jeopardized the health, safety, and welfare of dementia patients in an assisted living facility, is supported by a clearly defined and well-recognized public policy. Thus, we conclude Dorshkind's claim satisfies the first element of the public-policy exception.

2. *Discharge undermines public policy.* Under the second element, we must determine whether Dorshkind's discharge from employment undermines this public policy. Again, this is a question of law. *Fitzgerald,* 613 N.W.2d at 282. We consider the impact of the discharge on both the dismissed employee and other employees. *Id.* at 288. "An essential element of proof to establish the discharge undermines or jeopardizes the public policy necessarily involves a showing the dismissed employee engaged in conduct covered by the public policy." *Id.* at 287. If it can be shown the whistleblower engaged in conduct in

furtherance of public policy and was dismissed for doing so, and that discharge will discourage other employees from engaging in the same conduct, then public policy is undermined. *Id.* at 288.

Considering such factors, we conclude Dorshkind's discharge did undermine the public policy at stake. Dorshkind's conduct involved internally reporting what she believed were two coworkers forging state-mandated training documents pertaining to the care of dementia patients. Such an act advances a clear public policy. Moreover, the impact of the dismissal affected Dorshkind by punishing her for reporting conduct jeopardizing the health, safety, and welfare of dementia patients.

We next examine the impact of the discharge on other employees. Dorshkind's dismissal chills reporting by other employees for similar workplace illegalities. *Cf. Smith*, 464 N.W.2d at 685 (holding the discharge for asserting a workers' compensation claim violated public policy, even though there was no direct interference with the payment of benefits, because it would chill the claiming of workers' compensation rights and erode the employer's obligation to pay valid claims). As the Eighth Circuit accurately observed when applying Iowa law,

> If employers were permitted to discharge employees for such conduct, then employees would be hesitant to articulate safety concerns because to do so would potentially put their jobs at risk. Clearly, a public policy that encourages employees "to institute [a] new and [to] perfect existing safety programs" is undermined when an employee can be discharged for doing exactly what the policy encourages.

*Kohrt*, 364 F.3d at 902 (quoting Iowa Code § 88.1(1) (2003)). Thus, allowing employers to fire employees for whistleblowing effectively hangs a sword of Damocles over the heads of concerned employees like

Dorshkind, forcing them to choose between protecting others and sacrificing their employment.

An additional consideration is that Dorshkind made her complaint internally. We believe such a claim for internal whistleblowing stands for a number of reasons.[4] First, we have previously held internal reporting

---

[4]Other jurisdictions have similarly identified internal whistleblowing as a protected activity for purposes of establishing wrongful-discharge claims. *See, e.g.*, *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 500 (Colo. App. 2008) (holding "Colorado has a clearly expressed public policy against terminating an employee in retaliation for the employee's good faith attempt to prevent the employer's participation in defrauding the government" in case involving an employee who was fired for reporting concerns to his superiors about a plan to provide remediation services at a uranium enrichment plant); *Lanning v. Morris Mobile Meals, Inc.*, 720 N.E.2d 1128, 1130–31 (Ill. App. Ct. 1999) (holding a food service worker, who was fired for reporting the employer's unsafe food preparation practices in violation of the law, had a valid complaint of retaliatory discharge where she made an internal complaint, not a report to a public official); *Moyer v. Allen Freight Lines, Inc.*, 885 P.2d 391, 395 (Kan. Ct. App. 1994) (affirming the denial of a motion for directed verdict in favor of the employee who reported equipment failures to the company's management and was subsequently fired, based on protection afforded to employees reporting "to either company management or law enforcement officials" (emphasis removed)); *Barker v. State Ins. Fund*, 40 P.3d 463, 468 (Okla. 2001) ("Oklahoma law protects both internal and external reporting of whistle-blowers who establish a sufficient public policy violations from retaliatory discharge.").

Only the minority of courts refuse to protect an employee who makes an internal report. *See Wholey v. Sears Roebuck*, 803 A.2d 482, 496 (Md. 2002) ("To qualify for the public policy exception to at-will employment, the employee must report the suspected criminal activity to the appropriate law enforcement or judicial official, not merely investigate suspected wrong-doing and discuss that investigation with co-employees or supervisors.").

Some jurisdictions give less credence to the difference between internal and external reports, focusing instead on the nature of the claim. *See, e.g.*, *Green v. Ralee Eng'g Co.*, 78 Cal. Rptr. 2d 16 (Cal.1998) (rejecting termination following the employee's internal reports concerning the employer's alleged failure to comply with inspection practices mandated by regulations implementing the Federal Aviation Act); *Thomas v. Med. Ctr. Physicians, P.A.*, 61 P.3d 557, 565–66 (Idaho 2002) (reversing summary judgment for the employer, where the employee was fired for reporting misconduct to the supervisor); *Connelly v. State*, 26 P.3d 1246 (Kan. 2001) (finding state troopers who internally rejected and protested illegal activity in not enforcing laws designed for the public safety are protected from retaliatory discharge).

Other states have whistleblower statutes that provide discharged employees with a cause of action, regardless of whether the report was made internally or externally. *See, e.g.*, N.D. Cent. Code § 34-01-20(3) (West, current through the 2011 Reg. and Spec. Sess. of the 62nd Legis. Assemb.) (preventing the termination of an employee who "in good faith, reports a violation or suspected violation of federal, state, or local law,

is actionable, even where an applicable statute describes a method for lodging the whistleblower's complaint externally. *Tullis*, 584 N.W.2d at 239–40 (finding the employee had a valid wrongful discharge claim after complaining internally to his boss about unpaid wages and not utilizing the labor commissioner to determine the wages, as provided in Iowa Code section 91A.10). Second, whether the employee makes the complaint internally or externally does not change the public-policy considerations of our state. Third, discharging an employee for making an internal complaint still undermines the public policy. Fourth, the requirement of causation assures us the internal report was made to further the public policy of this state, rather than for other reasons.

Finally, it makes more sense that an employee would first discover the problem and report it internally before lodging a complaint externally.[5] Moreover, this allows the employer to correct the deficiency

_____

ordinance, regulation, or rule *to an employer, a governmental body, or a law enforcement official*" (emphasis added)).

Among the courts protecting internal whistleblowers, some have specifically addressed the advancement of public policy found in the common law, not statutes, when the employee's report serves to protect the public's health, safety, and welfare. *White v. Gen. Motors Corp.*, 908 F.2d 669, 671 (10th Cir. 1990) (granting protection to employees who were fired after complaining to management of defects in the installation of brakes in automobiles); *Watassek v. Mich. Dep't of Mental Health*, 372 N.W.2d 617, 621 (Mich. Ct. App. 1985) (upholding wrongful-discharge claim where the employee internally reported the abuse of patients at a mental-health facility), *disapproved of on other grounds by Phillips v. Butterball Farms Co.*, 531 N.W.2d 144, 146 n.15 (Mich. 1995). Other courts have protected employees who have made internal reports to promote workplace safety. *See, e.g., Pytlinski v. Brocar Prods., Inc.*, 760 N.E.2d 385, 388 (Ohio 2002) (protecting an employee who was terminated in contravention of public policy for complaining to the company's president about several violations of law, including OSHA regulations).

[5]Adhering to this logic, several other jurisdictions actually require the employee to internally report before making an external report, to afford the employer the opportunity to cure the problem. *See, e.g., Wagner v. City of Holyoke*, 404 F.3d 504, 509 (1st Cir. 2005) (holding that under Massachusetts law, the employee could not bring a claim where he failed to provide written notification to his supervisor before externally reporting misconduct); *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 72–73 (1st Cir. 2002) (same); *Garrity v. Univ. at Albany*, 755 N.Y.S. 2d 471, 473 (App. Div.

in a reasonably prompt manner. When the government becomes involved, the employer may take the position that the conduct does not violate a statute or rule to avoid sanctions. Then, the only resolution is a legal battle. By first bringing the problem to the attention of the employer without outside intervention, the matter can be handled quickly and in a less costly manner. However, if the employer does not correct a perceived problem, then the authorities can intervene to determine the extent of the problem and its amelioration.

Accordingly, we find Dorshkind's internal report of Oak Park's violations of law and regulations relating to the forgery of state-mandated documents for the dementia program is a protected activity as a matter of law. Preventing the retaliatory termination of internal whistleblowers not only shields the employee from tortious conduct, but also protects the public by ensuring "infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare" are properly reported. *Palmer*, 752 P.2d at 689.

### V. Punitive Damages.

Regarding the second issue, the crux of Oak Park's argument is that we have not previously recognized a claim for wrongful discharge arising from an employee reporting a violation of the administrative rules in question. For authority, Oak Park cites *Jasper*, where we said,

> Although the tort of wrongful discharge in violation of public policy has been recognized in Iowa for over twenty years, this case is the first time we have specifically recognized a cause of action for wrongful discharge arising from the refusal of the employee to violate administrative rules. Additionally, there has otherwise been no declaration that the subject matter of the administrative rules in dispute

---

2003) (rejecting a claim under the New York whistleblower statute where the employee did not give supervisors reasonable time to investigate and correct problems).

in this case were of the type that would support a tort of wrongful discharge.

764 N.W.2d at 774.  In *Jasper* the public policy involved was derived solely from an administrative rule.  *Id.*

Here, we derived the public policy from chapter 231C.  We used the administrative rules to show the agency recognized the public policy and passed rules to protect the patients in assisted living facilities.  In fairness, however, the training requirements were contained in an administrative rule.  *See* Iowa Admin. Code r. 321—25.34(1)–(4).  Thus, the reported violation is inextricably intertwined with the public policy supporting the exception to the at-will employment doctrine.  Moreover, the misconduct reported by Dorshkind preceded our holding in *Jasper*.  Accordingly, as in *Jasper*, an employer cannot willfully and wantonly disregard the rights of an employee based upon a violation of an administrative rule when at the time of the discharge, we did not recognize administrative rules as a source of public policy.  764 N.W.2d at 774.

Therefore, the district court erred in submitting Dorshkind's punitive damages claim to the jury.

**VI.  Conclusion and Disposition.**

We conclude that an employer's retaliatory discharge of an at-will employee, who internally reported her employer's forgery of state-mandated training documents for a dementia program in an assisted living facility, in contravention of state statutes and administrative regulations, violated public policy.  Therefore, we affirm that part of the court of appeals decision and the district court judgment regarding actual damages.  We also affirm the court of appeals decision, finding the district court should not have submitted the punitive damages claim to

the jury because at the time of Dorshkind's discharge, we did not recognize a public-policy exception to the at-will employment doctrine based upon a violation of administrative rules. Thus, on the punitive damages issue, we reverse the district court judgment and conclude Dorshkind is not entitled to punitive damages. We remand the case to the district court to enter judgment consistent with our decision.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND VACATED IN PART, AND REMANDED WITH DIRECTIONS.**

All justices concur except Cady, C.J., who specially concurs, and Mansfield, Waterman, and Zager, JJ., who concur in part and dissent in part.

#11–2100, *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*

**CADY, Chief Justice (concurring specially).**

I concur in the majority opinion, but write separately to explain two important points.

First, the protected conduct of internal whistleblowing only relates to a complaint by an employee of a violation by a coemployee or supervisor of a statute or regulation. The tort does not protect employees who lodge internal complaints over legitimate business practices by employers.

Second, our law protects whistleblowing that is either expressly protected by statute or impliedly protected by public policy. Our statute obviously only expressly protects external whistleblowing. But, our public policy impliedly protects internal whistleblowing because it is a clear public policy of this state to provide the elderly in Iowa who reside in assisted living homes a safe and dignified environment. This clear public policy is important enough that it implies protection for internal whistleblowing. Employers who choose to operate assisted living centers, as full partners in this public policy, must be expected to embrace internal complaints of regulatory or statutory violations by the business if the public policy is truly to be met. The public policy can be served by internal whistleblowing just as much, if not more, as by external whistleblowing.

Our law must assume employers want to comply with the statutory and regulatory scheme and want to know when their employees are failing to do so. Accordingly, the public policy of this state promotes and protects internal whistleblowing.

#11–2100, *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*

**MANSFIELD, Justice (concurring in part and dissenting in part**).

**I. Introduction.**

The majority opinion significantly and, in my view, ill-advisedly broadens the scope of Iowa's tort of wrongful discharge in violation of public policy. Under the majority opinion, any time a worker tells a coworker about an alleged violation of law related to health, safety, or welfare, the employer is at risk of litigation if the employer subsequently terminates that worker's employment. This decision is contrary to our precedents, which deferred to the other branches of government in defining the scope of the tort. Thus, our prior decisions required an express or implicit legislative or administrative determination to protect internal reporting. The present expansion of the law eliminates that requirement and thereby erodes Iowa's long-standing doctrine of employment at will. For the reasons set forth herein, I would hold the plaintiff did not engage in protected activity under Iowa law, and therefore the defendant's motion for directed verdict on liability should have been granted.[6]

Until today, our law was clear:

> To prevail on an intentional tort claim of wrongful discharge from employment in violation of public policy, an at-will employee must establish the following elements: (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the

---

[6]I concur in the result reached by the majority to the extent it affirms the court of appeals decision to set aside the punitive damage verdict. *See Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 773–74 (Iowa 2009) ("We have refused to permit punitive damages in an action for retaliatory discharge when the grounds for the discharge have been recognized for the first time in the instant case to be in violation of public policy."); *see also Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994).

employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.

*Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109–10 (Iowa 2011). We had reiterated that standard many times. *See Ballalatak v. All Iowa Agric. Ass'n*, 781 N.W.2d 272, 275 (Iowa 2010); *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009); *George v. D.W. Zinser Co.*, 762 N.W.2d 865, 871 (Iowa 2009); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004); *Davis v. Horton*, 661 N.W.2d 533, 535 (Iowa 2003); *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 n.2 (Iowa 2000).

This test was not difficult to apply, which was one of its virtues. The tort required both "the existence of a clearly defined and well-recognized public policy that protects employee's activity" and that "the employee engaged in the protected activity." *Berry*, 803 N.W.2d at 109–10; *accord Ballalatak*, 781 N.W.2d at 275; *Jasper*, 764 N.W.2d at 761; *George*, 762 N.W.2d at 871; *Lloyd*, 686 N.W.2d at 228; *Davis*, 661 N.W.2d at 535; *Fitzgerald*, 613 N.W.2d at 282 n.2. In other words, the employee had to have engaged in the activity that the statute or regulation protected. In the whistleblowing context, this meant *the employee's activity (i.e., reporting)* had to be the subject of a clearly defined and well-recognized public policy, not merely that the employee *reported on* something that was the subject of such a policy. The clearly defined and well-recognized policy had to cover reporting itself.

Consistent with that law, we had allowed internal whistleblowing claims to go forward where an applicable statute or regulation expressly recognized internal reporting. *See Tullis v. Merrill*, 584 N.W.2d 236, 239–40 (Iowa 1998) (finding that an internal complaint about the withholding of wages was protected activity because the statute and regulations provided that " 'an employee would be protected against discharge or

discrimination caused by the complaint to the employer'" (quoting Iowa Admin. Code r. 347—36.6(2))). And we had disallowed such claims where the plaintiff could not point to any statute or regulation that covered internal reporting. *See Ballalatak*, 781 N.W.2d at 278 (finding no protection for "internal complaints based on a concern that the employer may not be complying with workers' compensation laws").

The majority now sweeps away that previously clear legal standard and replaces it with a series of platitudes about health, safety, and welfare. Thus, the majority eliminates any distinction between external reporting and internal reporting with the broad-brush statement, "[W]hether the employee makes the complaint internally or externally does not change the public policy considerations of our state." The majority also says, "We should not allow an employer to ignore the substance either of a statute or administrative regulation or the statement of public policy that it represents." Quoting an out-of-state case, the majority adds, "'There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens.'" *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 879 (Ill. 1981).

These are noble sentiments, but the upshot is: Whenever an employee speaks to a coemployee about a violation of some law or regulation that relates to health, safety, or welfare, the employer puts itself in legal jeopardy if it later discharges that employee. I recognize the employee still must prove the complaint was the reason for the discharge, but questions of causation are often disputed and difficult to prove or disprove. Thus, a business may be reluctant to replace one employee with another person, whom it believes will do a better job, out of fear of litigation. This will be a new cost of doing business in Iowa.

We have been willing to accept that cost, and ought to continue to accept that cost, when the employee engaged in clearly defined and well-recognized protected activity. But there are myriad laws and regulations relating to "health, safety, and welfare." There are also many types of violations, ranging from the serious to the trivial. This case falls somewhere in the middle. The nursing home's employees acted deceitfully in falsifying training records, but there is no indication that the care received by any resident was affected. Also, employees participate in workplace discussions all the time. If we make the tort available whenever employee brings an alleged health, safety, or welfare violation to the attention of a coemployee, we have truly changed the nature of that tort in Iowa.

Previously, we said on many occasions that the public-policy exception in Iowa is a "narrow" exception to employment at will. *See, e.g.*, *Berry*, 803 N.W.2d at 109; *Ballalatak*, 781 N.W.2d at 275; *Jasper*, 764 N.W.2d at 762; *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997); *Lara v. Thomas*, 512 N.W.2d 777, 781–82 (Iowa 1994). This is consistent with the basic policy in Iowa that employers who do not engage in discrimination and have not entered into collective bargaining or other express or implied contractual relationships with their employees should generally be free to hire and fire employees without fear of having those decisions second-guessed in court. The majority opinion, I respectfully submit, is inconsistent with this characterization.

## II. The Plaintiff Only Engaged in Internal Reporting, Not External Reporting.

Oak Park Place is an unsympathetic defendant, and Karen Dorshkind is a sympathetic plaintiff. Still, I would like to highlight some

points in the trial record.[7]  Dorshkind never went to the Department of Inspections and Appeals (DIA) with her concerns, and the trial record indicates she didn't want the state involved at all.  Her "first concern was always the residents," but she was also concerned "for the company . . . what would happen."

On July 24, 2008, during a site visit by the DIA, two employees of Oak Park, Tim Hendricks and Kristi Niemer, were apparently engaged in falsifying training records.  They had the office door open and did not make any effort to conceal their actions from fellow employees.  Dorshkind was one of several employees who observed this activity.  Dorshkind mentioned immediately what she saw to two other employees.

Approximately six weeks later, Dorshkind telephoned her former supervisor, Marthe Jones, and brought up the incident.  As Jones recalled, Dorshkind "was worried that the State would find out and that there would be repercussions for Oak Park, and she said she did not know what to do."  Dorshkind was "afraid" that Oak Park was "going to lose [its] license."  Dorshkind also told Jones that it appeared Hendricks and Niemer were having an affair.  This was a "feeling" based on her observations and things she had heard.  Jones agreed to contact the company's human resources director, and Dorshkind went along with that plan.  Dorshkind never contacted the DIA, nor did anyone relay her observations to the DIA.

The next day, September 4, 2008, the human resources director and another manager, also based in Madison, went to Dubuque to investigate the matter.  After two days of interviewing and reviewing

---

[7]Like the majority, I present the facts in the light most favorable to Dorshkind, since she prevailed at trial.

documents, they handed a termination letter to Dorshkind that alleged she had "not been truthful" in several respects, including the relationship between the two employees, the falsification of training records, and a matter related to Dorshkind's own job duties.

Meanwhile, another witness to the July 24 events, Oak Park's director of nursing Denise Schiltz, was so upset at what she saw that she turned in a thirty-day notice of resignation that day. When her term of employment officially ended, Schiltz contacted the DIA and filed an anonymous complaint of what she had seen.[8] This caused the DIA to launch another inspection. Following a site visit in late September 2008 brought on by Schiltz's anonymous complaint, the DIA ultimately concluded that training documents had indeed been falsified. The DIA fined Oak Park $10,000 and issued a conditional certificate that temporarily prohibited Oak Park from admitting new residents.

**III. Under Our Whistleblowing Precedents, the Employee Must Have Engaged in Protected Activity as Measured by a Statute or Regulation.**

Let me now turn to our whistleblowing precedents. The first reporting or "whistleblowing" case we decided was *Tullis*. *See* 584 N.W.2d 236. There we held an employee who had been terminated for seeking reimbursement of amounts wrongfully withheld from his paycheck had a cause of action for wrongful discharge. *See id.* at 240. We found an explicit statutory underpinning for the employee's claim. Iowa law provides, " 'An employer shall not discharge or in any other manner discriminate against any employee because the employee has

---

[8]Although Schiltz acknowledged she could have filed an anonymous complaint with the DIA while she was still working for Oak Park, she waited until she was out of the facility. She did not believe anyone was in immediate jeopardy.

filed a complaint . . . .' " *Id.* at 239 (quoting Iowa Code § 91A.10(5) (1995)). We specifically found that the employee's internal letter to his employer amounted to a "complaint" under the statute. *Id.* at 239–40 (noting that regulations adopted under the statute provided that " '[a] complaint to the employer made in good faith would be related to the Act, and an employee would be protected against discharge or discrimination caused by the complaint to the employer' " (quoting Iowa Admin. Code r. 347—36.6(2))). Accordingly, the employee's firing violated a clear and express public policy. *Id.*

The key point in *Tullis* was that the employee's internal demand to his employer for unpaid wages amounted to a protected complaint *under the statute.* "We are convinced, as was the district court, that Tullis's formal letter to Merrill constituted a complaint related to unpaid wages for purposes of applying section 91A.10(5)." *Id.* at 240. *Tullis* was thus an *internal* reporting case where the statute protected *internal* reporting.

The same day we decided *Tullis*, we also decided *Teachout v. Forest City Community School District*, 584 N.W.2d 296 (Iowa 1998). *Teachout* should be viewed as an *external* reporting case where the law protected *external* reporting. In *Teachout*, a teacher's assistant was terminated after reporting alleged child abuse both within her school and orally to the Department of Human Services (DHS), although the school was unaware she had already contacted DHS at the time of her termination. *Id.* at 298–99. We emphasized that Iowa law mandated reporting of suspected child abuse to DHS and provided immunity from civil or criminal liability for individuals making such reports. *Id.* at 300 (quoting Iowa Code §§ 232.73, .75 (1995)). We stated:

> Although [the relevant statute] does not specifically mandate
> protection for an employee who in good faith makes a report
> of suspected child abuse, we think the forceful language of

the statute articulates a well-recognized and defined public policy of Iowa from which such protection can be implied.

*Id.* at 300–01.  Having found a "well-recognized and defined public policy," we then concluded the school's knowledge that Teachout *intended* to report child abuse to the authorities could support a wrongful-discharge claim.  *Id.* at 301.  As we explained:

> It would be contrary to the public policy articulated in our child abuse laws to allow an employer to take adverse employment action on the basis of an employee's intent to report child abuse.  That is because the employer's action would have the effect of *discouraging* the reporting of suspected abuse in direct opposition to the public policy of *encouraging* the reporting of child abuse.  Consequently, if Teachout had a subjective good-faith belief that child abuse had occurred, she is protected from any retaliatory action by her employer causally related to her intent or threat to report the abuse.

*Id.* at 301.

However, we concluded that Teachout failed to establish a jury question on the element of causation.  She had demonstrated only that her "termination occurred after the District learned she had engaged in a protected activity," not that her conduct was a determinative factor.  *Id.* at 302.

*Teachout* does not support the proposition that mere internal reporting of child abuse would be a protected activity.  To the contrary, even though there was no dispute the plaintiff had relayed her concerns internally, we implicitly acknowledged this would not amount to protected activity.  We said that we "must" consider whether Teachout's intent to report child abuse *to DHS* "could constitute protected activity so as to support a claim of retaliatory discharge."  *Id.* at 301.  But of course, if Teachout had already engaged in protected activity when she told her principal about the child abuse, it would have been unnecessary for us

to consider whether her intent to tell the authorities constituted protected activity.

In *Harvey v. Care Initiatives, Inc.*, we rejected a wrongful-termination whistleblowing claim brought by an independent contractor against a nursing home. 634 N.W.2d 681, 685–86 (Iowa 2001). The contractor there had "produced documents suggesting she was terminated for allegedly filing a complaint about the nursing home with the state's Department of Inspection and Appeals." *Id.* at 682. We observed that the relevant statutes allowed anyone to file a complaint, which would be kept confidential, but only protected employees and residents from retaliation or discrimination. *Id.* at 685–86. As we put it,

> Our legislature has made it clear through section 135C.46 that the prohibition against retaliatory discharge only applies to residents and employees of the health care facility. If our legislature wished to extend the prohibition to all persons, it would have used the term "persons."

*Id.* at 686. We also commented more generally that "[w]e find no compelling need, as we did for at-will employees, to support a wrongful-termination tort for independent contractors." *Id.* at 684.

*George*, another whistleblowing case, involved a statute that protected external reports and an employee who lost his job for making such an external report. *See* 762 N.W.2d at 871–72. The employee there alleged he had been terminated for complaining to the division of labor services about his employer's failure to take certain safety precautions during lead abatement jobs. *Id.* at 866–67. We found the employee had engaged in protected activity and had a common law cause of action because Iowa Code section 88.9(3) states " '[a] person shall not discharge . . . an employee because the employee has filed a complaint . . . under . . . this chapter.' " *Id.* at 871–72 (quoting Iowa Code § 88.9(3) (2007)).

In 2004, the United States Court of Appeals for the Eighth Circuit, applying Iowa law, held that an electrical utility employee who had been fired for openly disputing the safety of certain work procedures could pursue a public-policy wrongful-discharge claim against his employer. *Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 902 (8th Cir. 2004). The court noted that the Iowa Occupational Safety and Health Act has a stated policy of " '[e]ncouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to . . . institute new and perfect existing programs for providing safe and healthful working conditions.' " *Id.* at 899 (quoting Iowa Code § 88.1 (2003)). It further emphasized that Iowa law makes it unlawful for an employer to " 'discharge or in any manner discriminate against an employee because the employee has filed a complaint . . . .' " *Id.* at 899 (quoting Iowa Code § 88.9(3)).

Thus, although the Eighth Circuit found the issue "not free from doubt," it concluded that "the public policy expressed in IOSHA would be undermined if [the utility] were permitted to discharge an employee for voicing safety concerns." *Id.* at 902. In a footnote, the court pointed out that the plaintiff had made a "protected complaint" because the regulations clarified that the definition of complaint includes "internal, good faith complaints made by an employee directly to an employer." *Id.* at 902 n.4. *Kohrt* was thus an internal whistleblowing case where the law expressly protected internal reporting.

By contrast, in *Ballalatak*, we refused to find a cause of action where no statute covered the internal reporting in question. That case involved an employee who was fired after "relaying concerns" that his employer was not fulfilling its workers' compensation obligations to two fellow employees. *Ballalatak*, 781 N.W.2d at 278. We seemingly

approved the Eighth Circuit's *Kohrt* decision, and commented that "*Kohrt* and *Jasper* suggest internal whistle-blowing may be protected in certain circumstances." *Id.* at 277. However, we found that Iowa's workers' compensation statutes do not "provide support for internal complaints based on a concern that the employer may not be complying with workers' compensation laws." *Id.* at 278. As this court put it, "The public policy found in Iowa's workers' compensation statutes strongly protects injured employees, but does not extend to coworkers or supervisors who express concerns regarding whether the injured employees will be properly compensated." *Id.*

Just two years ago, we decided *Berry*, our most recent (until now) public-policy, wrongful-discharge case. This was not a whistleblowing case; rather, the case involved an injured employee who had been fired for bringing a personal injury lawsuit against an affiliate of his employer. *See Berry*, 803 N.W.2d at 108–09. We found that "chapter 668, Iowa's comparative fault statute, does not contain a clearly defined and well-recognized public policy of this state that would limit an employer's discretion to discharge an at-will employee." *Id.* at 112. We emphasized that we look at statutes, our constitution, and administrative regulations as the sources of public policy. *Id.* at 110. A relevant statute must either "expressly protect[] a specific employment activity from retaliation by the employer" or "clearly imply . . . the specific employment activity in question [is protected] from employer retaliation." *Id.* at 111.

*Berry*'s emphasis on the term of the statute to define the scope of the tort was not new. In the absence of statutory authority, we had disallowed wrongful-discharge claims brought by employees who complained about wrongs against fellow workers. *See, e.g., Ballalatak*, 781 N.W.2d at 278. Likewise, we had denied an independent

contractor's wrongful-termination claim where the statute specifically protected only employees. *See Harvey*, 634 N.W.2d at 686. "The use of statutes maintains the narrow public-policy exception and 'provide[s] the essential notice to employers and employees of conduct that . . . can lead to tort liability.'" *Ballalatak*, 781 N.W.2d at 277 (quoting *Jasper*, 764 N.W.2d at 763).

Under our precedent until now, an employee who internally reported an observation of illegal workplace conduct, in the absence of some statute or regulation recognizing or protecting such reporting, had not engaged in protected activity for purposes of the wrongful-discharge tort. If mere internal reporting of illegality were sufficient, then Ballalatak should have had a wrongful-discharge claim. *See id.* at 278 (finding no protection for "internal complaints based on a concern that the employer may not be complying with workers' compensation laws"). In *Ballalatak*, we reiterated that "Iowa's workers' compensation statutes provide a clear public-policy expression that employers are required to compensate employees for injuries arising out of and in the course of employment." *Id.* Yet we said that Ballalatak's "internal complaints" about his employer's failure to comply with these duties did not amount to protected activity. *Id.* We acknowledged that, at least for purposes of summary judgment, Ballalatak's "motives were to ensure compliance with the law and benefits for those under his supervision." *Id.* However, "Ballalatak ha[d] not pointed to any Iowa law which clearly expresses protection for such actions," i.e., *his* actions. *Id.*

All of this was consistent, as noted above, with our bedrock rule in Iowa that the employee must have *engaged in* the protected activity. *See Berry*, 803 N.W.2d at 110; *Ballalatak*, 781 N.W.2d at 275; *Jasper*, 764

N.W.2d at 761; *George,* 762 N.W.2d at 871; *Lloyd,* 686 N.W.2d at 228; *Davis,* 661 N.W.2d at 535; *Fitzgerald,* 613 N.W.2d at 282 n.2.

**IV. No Legislation or Regulation Recognized the Internal Reporting That Occurred in This Case; It Cannot Be Considered Protected Activity.**

With the foregoing caselaw in mind, I return to this case. Chapter 231C provides, "Any person with concerns regarding the operations or service delivery of an assisted living program may file a complaint with the [DIA]." Iowa Code § 231C.7(1) (2007). It further states, "An assisted living program shall not discriminate or retaliate in any way against a tenant, tenant's family, or an employee of the program who has initiated or participated in any proceeding authorized by this chapter." *Id.* § 231C.13. Thus, an Iowa statute recognizes outside whistleblowing to the DIA. *See id.* § 231C.7(1). An Iowa statute also expressly protects individuals, such as Dorshkind's coworker Schiltz, who report misconduct to the DIA. *See id.* § 231C.13.

Dorshkind, however, did not complain to the DIA. Nor is there evidence she intended to complain to the DIA, or threatened to go to the DIA, or wanted her internal complaints passed along to the DIA. To the contrary, she was worried the state would find out and there would be repercussions for Oak Park. Additionally, there is no evidence that any of Dorshkind's actions even unwittingly led to the DIA investigation. In short, this not a case where an employee made, or intended to make, a statutorily recognized or protected complaint. *Cf. George,* 762 N.W.2d at 871–72; *Teachout,* 584 N.W.2d at 300–01; *Tullis,* 584 N.W.2d at 239–40.

The majority notes accurately that Iowa has a strong statutory policy of protecting residents of assisted living homes. The stated purposes of chapter 231C are:

> *a.* To encourage the establishment and maintenance of a safe and homelike environment for individuals of all income levels who require assistance to live independently but who do not require health-related care on a continuous twenty-four-hour per day basis.

> *b.* To establish standards for assisted living programs that allow flexibility in design which promotes a social model of service delivery by focusing on independence, individual needs and desires, and consumer-driven quality of service.

> *c.* To encourage public participation in the development of assisted living programs for individuals of all income levels.

Iowa Code § 231C.1(2). And the trial record indicates that Oak Park violated the law by not providing required training, *see* Iowa Admin. Code r. 321—25.34(1)–(4), and by "attempting to obtain or retain a certificate by fraudulent means, misrepresentation, or by submitting false information," Iowa Code § 231C.10(1)(*c*).

But again, our precedents require a clearly defined and well-recognized public policy that protects the activity in question, i.e., internal reporting. Just because external reporting is the subject of a clearly defined and well-recognized statutory policy, it does not follow that internal reporting would be, at least when the employee's actions did not result in and were not intended to result in an outside report.

It bears emphasis, as we pointed out in *Berry*, that a statute covering a particular activity does not have to directly bar employer retaliation in order to qualify as a clearly defined public policy. 803 N.W.2d at 111. "There need not be an express statutory mandate of protection . . . ." *Teachout*, 584 N.W.2d at 300. It is sufficient if the statute explicitly *recognizes* the activity such that an employer's retaliatory discharge for engaging in the activity would "conflict with" achievement of the legislative goal. *Lara*, 512 N.W.2d at 782. Hence, even if chapter 231C did not contain section 231C.13 prohibiting

retaliation against whistleblowers to the DIA, section 231C.7(1) authorizing confidential reports to the DIA likely would be enough to sustain a wrongful termination claim *if* Dorshkind had been let go for reporting the records falsification to that agency.

Still, there must be enough in the statute to "*clearly imply* the statute protects the specific employment activity in question from employer retaliation." *Berry*, 803 N.W.2d at 111 (emphasis added). Chapter 231C does not mention internal reports at all. Given the absence of a reference to internal communications, I cannot find chapter 231C "clearly implies" that persons making those kinds of reports are protected from retaliation.[9]

An additional consideration here is that the legislature made a specific decision in 2003 to facilitate the bringing of complaints before the DIA. *See* 2003 Iowa Acts ch. 166, §§ 14, 20 (codified at Iowa Code §§ 231C.7, .13 (Supp. 2003)). It authorized the filing of these complaints, Iowa Code § 231C.7(1) (2007); it required the identity of persons bringing complaints to be kept confidential, *id.*; it directed the DIA to establish a procedure for handling these complaints, *id.* § 231C.7(2); and it made it illegal for an employer to retaliate against anyone who initiated or participated in a proceeding before the DIA, *id.* § 231C.13. Given these

---

[9]Other states have taken a variety of approaches to public-policy-based wrongful-discharge claims. *See* Gerard Sinzdak, Comment, *An Analysis of Current Whistleblower Laws: Defending a More Flexible Approach to Reporting Requirements*, 96 Cal. L. Rev. 1633, 1643–44 (2008) (noting that around forty states recognize common law wrongful-discharge claims arising from a violation of public policy, that some apply that claim to whistleblowing, and that "the requirements of a common law claim vary substantially from jurisdiction to jurisdiction . . . includ[ing] whether the whistleblower must report externally or internally in order to receive protection"). As I have noted, Iowa has not taken a categorical approach that either extends to or does not extend to internal complaints. Instead, the focus has been on whether the employee's internal complaints were themselves covered by a clearly defined and well-recognized public policy.

express legislative determinations in 2003 to protect external reporting, but the complete absence of legislative references to internal reporting, I have grave difficulty concluding that the latter is protected by a clearly defined and well-recognized public policy embodied in legislation. We made this general point in *Ballalatak*, noting that the legislature's decision to enact anti-retaliation statutes covering "other circumstances" could not support the employee's argument that he had engaged in protected activity in that case. 781 N.W.2d at 278.

The legislature's decision to limit the scope of sections 231C.7 and 231C.13 to persons who report externally to the DIA is not an unreasonable choice. After all, as illustrated by this case, an internal report may never get to the DIA and may not result in corrective action. In any event, reasonable or not, it is the legislature's choice, which under our precedents we are bound to follow.

**V. Conclusion.**

For the foregoing reasons, I respectfully dissent in part. In my view, the defendant's motion for directed verdict on liability should have been granted.

Waterman and Zager, JJ., join this concurrence in part and dissent in part.